# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 7, 2012 Session

## STATE OF TENNESSEE v. DAVID HOOPER CLIMER, JR.

**Appeal by permission from the Court of Criminal Appeals**
**Circuit Court for Gibson County**
**No. 8704      Clayburn Peeples, Judge**

_____

**No. W2010-01667-SC-R11-CD - Filed April 19, 2013**

_____


We granted this appeal to determine whether the trial court erred by denying the defendant's motion to suppress his statements to the police on the grounds that they were elicited in violation of his constitutional right to counsel and were involuntary. We have determined that the defendant did not unequivocally request counsel and therefore did not invoke his constitutional right to counsel. Nevertheless, we have also determined that the State failed to prove by a preponderance of the evidence that the defendant waived the rights enumerated in Miranda v. Arizona, 384 U.S. 436 (1966). Thus, we hold that the defendant's statements were erroneously admitted into evidence, but the physical evidence discovered as a result of his statements was properly admitted because the totality of the circumstances shows that the defendant's statements were voluntary and not coerced. We also hold that the State failed to establish that the erroneous admission of the defendant's statements was harmless beyond a reasonable doubt. Accordingly, the defendant's convictions of second degree murder and abuse of a corpse are vacated, and this case is remanded for further proceedings.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal**
**Appeals Reversed in Part; Convictions Vacated; and Case Remanded**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., and JANICE M. HOLDER, WILLIAM C. KOCH, JR., AND SHARON G. LEE, JJ., joined.

C. Mark Donahoe and Andrea D. Sipes, Jackson, Tennessee, for the appellant, David Hooper Climer, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; J. Ross Dyer, Senior Counsel; Clarence E. Lutz, Assistant Attorney General; Garry G.

Brown, District Attorney General, Larry Hardister and Stephanie J. Hale, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

David Hooper Climer, Jr. ("Defendant") was charged with and convicted of first degree premeditated murder and abuse of a corpse arising from the 2007 death of his sixty-two-year-old mother, Doris Anne DeBerry, and the dismemberment of her corpse.[1]  The circumstances leading up to and surrounding the victim's disappearance and Defendant's custodial interrogation, as well as the proof introduced at trial, are summarized below.

Emily Fisher, the victim's younger sister and Defendant's aunt, called the victim a few days before Thanksgiving 2007 and invited her to Thanksgiving dinner.  The victim declined, explaining that she planned to cook at home for her grown grandson, Daniel Mangles.  However, that did not happen.  When, instead, that holiday passed without word from the victim, Tracy Davis—the victim's daughter, Defendant's sister, and Mr. Mangles's mother—called the victim's residence to ask why she had not contacted Mr. Mangles.  Defendant, who lived with the victim in 2007, answered and told Ms. Davis that the victim had "left with a Mexican man named Ray" to visit Ray's family.  Defendant gave Ms. Davis no other information about Ray and seemed unconcerned by his mother's sudden departure.

Ms. Fisher also called the victim's home five or six times between Thanksgiving and Christmas 2007, but no one answered the phone and no one responded to the messages she left.  Eventually, Ms. Fisher received a Christmas card from the victim, which was unusual.  Ms. Fisher had always sent the victim Christmas cards, but she had never before received a Christmas card from the victim.  Ms. Fisher recognized the name on the card, "Anne," as the name her sister used, but she knew the handwriting and signature were not that of the victim.  On Christmas Day, Ms. Fisher again called the victim's residence.  When no one answered, Ms. Fisher left a message asking the victim to call her, but she did not hear back from anyone.

Still concerned about her mother's disappearance, Ms. Davis talked with Defendant near the end of 2007 about filing a missing person's report.  Ms. Davis recalled that

---

[1] The victim's surname is also spelled "Deberry" in Defendant's brief and at various places throughout the record.  We use "DeBerry" in this opinion, consistent with the spelling used on the autopsy report.

Defendant did "not really" express concern for the victim's safety and told Ms. Davis that "he was getting pushed in a corner."

On New Year's Eve, Ms. Fisher received a call from Ms. Davis, who was crying. The following day Ms. Fisher called the victim's residence. When no one answered, Ms. Fisher left the following message: "If I don't hear from someone today I'm calling the police." Later that day, Defendant called Ms. Fisher and told her that the victim had taken all of her clothing and medications and "gone off with a Mexican looking guy named Ray." Defendant said he had last seen the victim on December 11, 2007. Defendant denied knowing where the victim had met Ray, or where the couple had gone, but he "guess[ed]" they had gone to Mexico.

Ms. Fisher did not believe the victim "would go off with anybody, a man," because the victim had given up on men after her third marriage ended in divorce. She called Defendant the next day, January 2, 2008, and inquired again about the victim. When Defendant said he had not heard from the victim, Ms. Fisher asked him to let her know if he did. Ms. Fisher did not hear back from Defendant. She subsequently contacted the police and reported the victim missing.

On January 7, 2008, the Tennessee Bureau of Investigation alerted the Gibson County Sheriff's Department that the victim had been reported as missing. Detective Steve Grooms began investigating her disappearance. On January 24th, Detective Grooms decided to interview Defendant and had a hidden camera installed in his office for that purpose before leaving to pick up Defendant at the house he shared with the victim. When Detective Grooms and other officers arrived at the residence, two vehicles were in the driveway, but no one answered the door.

The officers left, obtained a search warrant, and returned at approximately 2:00 p.m. to execute the warrant. When they arrived, Defendant exited the house, and officers handcuffed him, placed him in a patrol car, and a short time later, transported him to the Gibson County Sheriff's Department, where he was "booked" into the jail at 2:37 p.m.[2]

Meanwhile, officers executed the search warrant at the victim's residence. The initial search of the property took several hours. Officers collected samples from what appeared to be blood stains in several places in the home. Officers found cleaning supplies and latex gloves in the kitchen. The victim's bedroom was empty of furniture and contained none of her belongings—only some tools. Eventually, the officers located the victim's Bible and

---

[2] Defendant has not challenged the validity of the search warrant or the lawfulness of his warrantless arrest. An arrest warrant issued on January 26, 2008.

-3-

hairbrush, but found no clothing or furniture. Officers discovered the victim's bloodstained watch in the glovebox of a blue car registered to the victim and parked on the property.

Eighteen items recovered in the search of the residence were eventually tested for blood stains. Blood stains matching the victim's DNA profile were discovered on pieces of paneling from the hallway and main bathroom, on cabinet doors from under the kitchen and main bathroom sinks, on a "telescopic handle" found in the kitchen, on carpet from the victim's bedroom, and on the victim's watch. Officers found a hacksaw in the living room, but it tested negative for the presence of blood. Officers excavated a recently used burn pile in the backyard of the residence and found mattress springs but unearthed no human remains. Additionally, a portion of a box located at a storage unit Defendant rented also tested positive for the presence of blood that matched the victim's DNA profile.

While officers completed the search, Defendant remained confined in a holding cell, known as the "drunk tank," of the Gibson County Jail. Around 10:30 p.m., officers escorted Defendant to Detective Grooms's office for an interrogation that lasted approximately four hours and comprises one hundred pages of transcript. The interrogation began with the following exchange.[3]

Detective Grooms: You ever met me before David?

Defendant: I don't think so.

Detective Grooms: Have you not?

Detective Grooms: My name is Steve Grooms, I am the chief detective here for the Sheriff's office okay. And I want to talk to you okay. I need to talk to you about some things and I believe deep down you want to tell or talk to me about some things, I believe you do and before I do, technically you are not under arrest at this time and you are not being charged with anything, OK and I just want to talk to you about some things and before I do I need to read your rights to you, OK. That's something we do to everybody that comes in here and you can make a statement about anything . . . that's our policy . . thats our procedure we done that for years.

---

[3] Verbatim quotations from the transcript of the interrogations appear throughout this opinion without modifications for typographical or grammatical errors.

Defendant: Alright.

Detective Grooms: Yea. Listen up okay, before I ask you any questions you must understand your rights, you have the right to remain silent, anything you say can be used against you in court, you have the right to talk to a lawyer for advice before I ask you any questions, and have him with you during questioning. If you cannot afford to hire an attorney one will be appointed to represent you before any questioning if you wish, if you decide to answer questions now without a lawyer present you still have the right to stop answering at any time, you also have the right to stop answering at any time until you speak to a lawyer. Do you understand your rights? Do you understand what I have read you?

Defendant: Well I can't afford a lawyer I can tell you that.

Detective Grooms: Okay, I just read it to you, if you can't afford a one, one will be appointed to you. Okay UH you want to look this over before your sign it and by signing this you are not admitting to anything. You are just saying that you want to talk to me.

Defendant: I don't really have anything to say I mean I don't know.

Detective Grooms: OK. I mean do you want to talk to me to see what I got to say to see what you have to say?

Defendant: Well, I want to hear what you got to say.

Detective Grooms: OK then if you don't mind look that over. You want to look that over before you sign it? You welcome to.

Defendant: You mean I can have an uh an appointed lawyer right now?

Detective Grooms: Well, not at this time.

Defendant: Cause you know uh I know zero about law you know uh.

Detective Grooms: Just like it says, if you want to talk we can talk and you can stop it at any time.

Defendant: Well if I am not being charged with anything why, why is this even being

Detective Grooms: Because that is policy procedure

Defendant: Well then if I am not being charged with anything why am I not just cut loose?

Detective Grooms: Because I need to get a statement from you for one.

Defendant: It will probably haunt me for signing this.

Detective Grooms: It's up to you.

Defendant: You can get a statement from me without signing this, can't you?

Detective Grooms: Yea, I have to write down you refused to sign. I read your rights to you right you understand, isn't that right?

Defendant: Yea.

Detective Grooms: I just need you to acknowledge that. Is that true?

Defendant: Well you gave me this and you read me Miranda.

Detective Grooms: Ok. You don't have to sign it. I do want you to make sure that you understand what I read to you.

Defendant: I've just always been told, don't . . . . . . don't do anything that'll haunt you later on . . . you know, . . I, I

Detective Grooms: I can't blame you for that

Defendant: I mean . . . . .

Detective Grooms: But you do understand your rights, is that correct?

Defendant:        Yea

Detective Grooms:  Ok.  You have looked over this form.

Defendant:        Yes I did.

Detective Grooms:  You feel comfortable talking to me?

Defendant:        Well not really I am scared to death man because uh I haven't did anything you know.

Detective Grooms:  Ok.  I am not saying that you have.  I'm just saying that I just want to talk to you and basically I know this scares a lot of people . . . . but we do this . . . . I mean we do this to even somebody that bothers pets.

Defendant:        Me and my dad my dad done talk to me about this he's like . . . he like . . . uh probably fixen to get took over to the county and they going keep you awake for 48 hours and drill you with a light in your face until the . . . . .

Detective Grooms:  Why did your dad tell you that?

Defendant:        Uh, just I don't know.  Just we been talking about my mother you know taking off you know and my sister has been raising all kind of hell and you know . . . and uh and you know and I'm like I don't know what to do.  You know I can't produce her you know.  Good grief you know.  She's a grown woman.

Detective Grooms:  So you're not going to sign this?  It's not no big deal.

Defendant:        Naw I

Detective Grooms:  I am not going to be mad at you or anything

Defendant:        I mean I don't want to.

Detective Grooms: Ok but I just want to make sure you understand your constitutional rights. Ok. You don't have to sign it. I mean it's no big deal. But that's what I want to talk to you about you know we're investigating your mother being missing

Defendant: Right yea you know

Detective Grooms: Do you know . . . . when when was the last time you seen your Mom?

Defendant: December the 11th.

Detective Grooms: December 11, 2007.

Defendant: Yea. That's a Tuesday.

Detective Grooms: A Tuesday. Where did she go?

Defendant: I don't know.

At this point, the discussion diverged from the victim's whereabouts into shared childhood experiences, mutual acquaintances, and religious beliefs. About an hour passed before the dialogue returned to the victim's disappearance:

Defendant: Here's the deal uh, from the way you talk to me uh, I don't think you believe me, if I was to say anything to you. Any kind of story . . .

Detective Grooms: And I, and I told you tell me, tell me.

Defendant: I'm scared to without an attorney here.

Detective Grooms: I'm here, well uh . . .

Defendant: I'm just telling you I'm scared to, you know

Despite assurances from Detective Grooms that he had heard "everything" during his career, Defendant avoided talking specifically about the circumstances of the victim's death, although he repeatedly assured Detective Grooms that he had done nothing intentionally. For

the next two hours the discussion returned to various topics unrelated to the victim's whereabouts or death.

Approximately three hours into the interrogation, Defendant suddenly began to explain the circumstances of, and his role in, the victim's disappearance and death. Defendant cried sporadically during this explanation. He also repeatedly asked Detective Grooms to shoot him, saying he had been too "chicken" to do it himself.

Defendant said he and the victim enjoyed a Thanksgiving meal she cooked, but "toward the end," the victim "got smashed as usual but not, not that bad." Defendant, who worked as an electrician, did not work on Thanksgiving but was required to work the three days following Thanksgiving to complete a project by Sunday. Defendant recalled coming home from work about 8:00 p.m. on the Friday after Thanksgiving and finding the victim lying on their front porch. Defendant described the victim as very drunk—"smashed," and said she had fallen and could not get up on her own. Defendant helped her up and into the house, bathed her, and helped her to bed. All the while the victim complained of her "tailbone" hurting.

On Saturday, Defendant looked into the victim's bedroom before leaving for work, but he did not wake the victim. When Defendant telephoned her from work about 9:00 a.m., she complained of "not doing too good." Defendant then told his supervisor, Donnie Martin, he needed to leave early, but Defendant did not "want to tell him why." According to Defendant, Mr. Martin fired him for asking to leave early, so Defendant left.

When Defendant arrived home, the victim had "messed again." As Defendant cleaned her, the victim again complained of pain in her "tailbone," which she believed was broken. The victim could not get out of bed or walk on her own, but she declined to go to a hospital because she had no insurance. Defendant prepared food for the victim and checked on her a few more times throughout the day. That evening, a friend visited Defendant, and they "partied a little bit." Defendant checked on the victim when he awoke about 10:30 a.m. the next day, Sunday. He discovered her deceased in bed, with her mouth and eyes open, "brown stuff" on the floor near her bed, and the room smelling of alcohol. Defendant performed CPR but left for a while when his efforts were unsuccessful. When he returned home, the victim was "stiff."

Defendant said he "flipped out" upon finding the victim's body. Fearing he would be accused of homicide because of his prior criminal record, which included an assault against the victim, and the severe bruising on the right side of the victim's face, Defendant failed to inform anyone of the victim's death. Defendant left the victim's body undisturbed but "cried" for "a solid week," explaining that he would "[j]ust go in and look and cry."

-9-

Defendant also "begged God right beside her bed Lord please bring her back I'll do you know anything."

By early December, the victim's body had begun to smell, so Defendant decided he needed to dispose of it somehow. On December 5, 2007, based on information obtained from watching "forensics" television shows, Defendant "cut her up" and "buried her," but not her "whole body." Saying he could "hardly talk about it," Defendant explained that he "had seen this show" about "dental records and all that," so he severed the victim's head, attempted to "burn it" in a "metal bucket," crushed it, and then threw away both the bucket and its contents in a dumpster in Humboldt. Defendant said the burning of the victim's severed head occurred in his backyard. Defendant buried most of the rest of the victim's dismembered corpse in a wooded area several miles away in Madison County. Eventually Detective Grooms produced a map of the area and asked Defendant to point out where he had buried the victim's remains. Defendant complied.

Before ending the interrogation between 2:30 and 3:00 a.m. on January 25, 2008, Detective Grooms inquired whether Defendant had been provided with food, drink, and a blanket:

Detective Grooms: Did you eat, did you eat any supper?

Defendant: I had lunch.

Detective Grooms: You want something to eat?

Defendant: If you don't mind.

Detective Grooms: And something to drink?

Defendant: If you don't mind.

Detective Grooms: And a blanket?

Defendant: A blanket definitely.

Detective Grooms: You got a mat?

Defendant: I had a mat back there. I don't know if it's still there or not.

-10-

Detective Grooms:   Yeah.

Defendant:   Am I going to stay in that drunk tank?

Detective Grooms:   Are you on the floor?  Are you on the floor or a bunk?
The concrete slab?

Defendant:   The drunk tank, yeah.

Detective Grooms:   I'm going to definitely get you a blanket and something
to eat, something to drink.  Ok?

Later in the morning of January 25th, approximately 8:00 to 8:30 a.m., Defendant rode with Detective Grooms in a patrol car and directed the police to the burial site in Madison County.[4]  The victim's body was exhumed and transferred to the Medical Examiner's Office in Memphis.  Defendant returned to confinement in the Gibson County Jail.

A warrant for Defendant's arrest issued between 8:00 and 9:00 a.m. on January 26, 2008.  At 5:38 p.m. that same day, Detective Grooms began a second interrogation of Defendant, the transcript of which comprises thirty pages.  Defendant complained initially that he had not been given a mattress or blanket to sleep on and that he had been awakened every fifteen minutes.  Detective Grooms apologized, explained that Defendant had been placed on suicide watch, and promised to get Defendant a mattress and blanket after the interrogation ended.  The following exchange then occurred.

Detective Grooms:   Do you, you want to talk to me?

Defendant:   So, what do you want to know?

Detective Grooms:   Well, before I ask you I have to read your rights to you
again, David.

Defendant:   Why is that?  You done read them to me once.

_____

[4] Detective Grooms and Defendant talked en route to the grave site, and this conversation was surreptitiously recorded and later transcribed.  Although Detective Grooms testified at the suppression hearing generally about this conversation, he did not do so at trial.  Additionally, neither the recording nor the transcript was introduced into evidence at trial.  Detective Grooms admitted that he did not advise Defendant of his Miranda rights prior to this conversation.

Detective Grooms: I know. And you told me you understood them before. Ain't that right, huh?

Defendant: I thought I did everything I was supposed to already.

Detective Grooms: Well, I just have a few questions I need to ask. But if I read your rights to you and you don't want to answer them, that's your choice.

Defendant: Ok.

Detective Grooms: That's your right.

Defendant: I know the Miranda rights.

Detective Grooms: Ok. I'm going to read them to you again. Ok? Cause I want, I want you to make sure that you know your rights and understand them. Ok. Just like before. Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. If you have any questions, I'm sorry excuse me, you can have him with you during questions. If you can not afford to hire an attorney one will be appointed to represent you before any questions if you wish for one. If you decide to answer a question now without a lawyer present you still have the right to stop answering any time. You have the right to stop answering anytime until you speak to an attorney. Do you understand this?

Defendant: Yeah.

Detective Grooms: Do you want to sign this one?

Defendant: No.

Detective Grooms: Ok.

Defendant: It don't matter.

-12-

Detective Grooms: I'm signing here saying that I witnessed it and like I said before by you

Defendant: (inaudible mumbling)

Detective Grooms: By you signing this it don't, it don't . . . .

Defendant: It don't matter one way or the other.

Detective Grooms: Ok. But you understand what I read to you? You looked at this form, do you want to look this one over again too? You looked at the last one.

Defendant: I don't know.

Detective Grooms: You understand this, correct?

Defendant: I've heard them on TV enough.

Detective Grooms: Well, TV and reality bubba is two different things.

Defendant: I mean, I know what you're saying. I've got the right to have an attorney here.

Detective Grooms: But you understand what I've read to you, correct?

Defendant: Yeah.

Defendant's second statement was largely consistent with his first, but he provided additional details in response to Detective Grooms's specific questions. Defendant acknowledged using a hatchet, a hammer, a hacksaw, and a battery-powered reciprocating saw to dismember the victim's body. Defendant threw these tools in the trash after realizing he would be unable to remove all evidence from them. When Detective Grooms asked Defendant to explain the blood discovered in the victim's bedroom, Defendant stated he had dismembered the victim's body in the kitchen in a green tub with a lid and denied splattering blood in the victim's bedroom. Defendant speculated that the police had probably discovered vomit in the bedroom or perhaps even canine blood from a dog that had been shot in the residence at an earlier time. Defendant remembered transporting the victim's body to the burial site in the green tub used to dismember her corpse and later burning the tub and its lid in his backyard.

-13-

Defendant admitted having previously handled the victim roughly, especially when she became very drunk and lost control of her bowels, and he conceded having occasionally slapped her on the back or thigh. Defendant nevertheless issued a "guarantee" that he had not committed "first or second degree murder" of the victim. When Detective Grooms suggested that Defendant might have accidentally killed the victim, Defendant initially denied striking her the weekend of her death, but he later equivocated.

Detective Grooms: And you didn't hit her that weekend?

Defendant: And, and if I did cause her death, I'm sorry. You know what I mean?

Detective Grooms: I believe you.

Defendant: And I don't, I don't think I did. You know what I mean?

Detective Grooms: You don't think you did?

Defendant: Yeah, I don't think I did.

Detective Grooms: So I mean, So does that mean you did hit her?

Defendant: That means I have. You know . . .

Detective Grooms: I'm talking about, did you hit her that weekend that she died?

Defendant: I may have, man. And what if I did? Is that going to make it a lot worse?

Detective Grooms responded that it would be worse and would "explain why" Defendant severed the victim's head—because he was "scared" the police would discover evidence showing he had injured her. Defendant stated that he severed the victim's head for the same reason he severed each limb—to dispose of the body. Defendant admitted using the kitchen stove to boil the victim's severed hands and feet in an unsuccessful attempt to remove the flesh and then destroy the bones. Defendant denied hitting the victim in the head or severing her head for the purpose of destroying evidence.

-14-

A Gibson County Grand Jury indicted Defendant for first degree premeditated murder[5] and abuse of a corpse.[6] Defendant filed notice that he intended to raise an insanity defense to the abuse-of-corpse charge.[7] Defendant also moved to suppress his statements to Detective Grooms, arguing that the statements were involuntary and elicited in violation of his federal and state constitutional right to counsel.[8]

At the suppression hearing, Defendant relied on the transcripts of the two interrogations, but offered no other proof in support of his motion. Testifying for the State, Detective Grooms described the circumstances surrounding the interrogations. On cross-examination, Detective Grooms explained his rationale for not providing Defendant with counsel before proceeding with the initial interrogation:

A. He did not specifically ask for an attorney.

Q. Well, Detective, did you make the statement that he couldn't have an attorney at this time?

A. He asked could he have a Court appointed attorney that night at 10:30. I said, "No, not at this time." That was my statement.

---

[5] "First degree murder is [a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2010). Premeditation is "an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself" although "the purpose to kill" need not "pre-exist in the mind of the accused for any definite period of time." Id. § 39-13-202(d). However, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id. We cite to the current statutory language, which remains the same as at the time of Defendant's offenses.

[6] "A person commits [abuse of a corpse] who, without legal privilege, knowingly [p]hysically mistreats a corpse in a manner offensive to the sensibilities of an ordinary person." Tenn. Code Ann. § 39-17-312(a)(1) (2010).

[7] "It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts." Tenn. Code Ann. § 39-11-501(a) (2010). The defendant must prove the insanity defense by clear and convincing evidence. Id.

[8] Defendant also moved to sever the offenses, but the trial court denied the motion. Defendant challenged the trial court's denial of the motion to sever in the Court of Criminal Appeals and in his application for permission to appeal, but this Court granted Defendant's application on the sole issue of whether the Court of Criminal Appeals erred by affirming the trial court's denial of Defendant's motion to suppress.

Q.      Okay.  Did you do anything about getting him an attorney that next morning?

A.      No, sir.

Q.      Why not?

A.      He didn't ask for an attorney.

Q.      Is it your position as you sit there today that Mr. Climer made no request for an attorney?

A.      That's correct.

Q.      Why did you not wait until the next morning when an attorney could be appointed for Mr. Climer?

A.      If Mr. Climer would have asked for an attorney I would have.

Detective Grooms also testified that "during the course of the first interview" Defendant "volunteered to take me to where he buried the remains of his mother."

Jeff Maitland, Chief Deputy of the Gibson County Sheriff's Department, also testified for the State at the suppression hearing.  Chief Deputy Maitland had no personal knowledge of Defendant's treatment during his confinement at the Gibson County Jail but was familiar with the operation of the jail and the policies applicable to inmates at the time of Defendant's confinement.  Standard operating procedure required maintaining the temperature of the jail between sixty-eight and seventy degrees.  Jail policy required issuing each inmate a mattress, a blanket, and toilet paper, although inmates placed on suicide watch were not allowed blankets and were monitored, but not awakened, every fifteen minutes around the clock to ascertain their welfare.  Inmates confined in the "drunk tank" had twenty-four-hour access to a commode, toilet paper, a sink, and drinking water.  Inmates received three meals a day, with breakfast served between 4:15 a.m. and 5:30 a.m., lunch served between 11:00 a.m. and 12:15 p.m., and dinner served between 4:15 and 6:00 p.m.  After reviewing Defendant's "booking sheet," Chief Deputy Maitland stated that Defendant, who was "booked" at 2:37 p.m. on January 24, 2008, should have been served dinner between 4:15 and 6:00 p.m., along with the other inmates.

On March 1, 2010, the trial court denied Defendant's motion to suppress, stating: "I don't think that there is any evidence that he was abused as a prisoner or kept under circumstances that would affect his decisions." The trial court acknowledged that Defendant "made some statements about an attorney," but concluded that Defendant failed to invoke his right to counsel unequivocally and unambiguously.

On March 23, 2010, Defendant's four-day trial began. Ms. Davis and Ms. Fisher testified, relating the circumstances, as summarized above, that caused them to become concerned about the victim and to report her as missing.

Donnie Martin, field manager of the company for which Defendant worked as an electrician in 2007, testified that Defendant reported for work the day after Thanksgiving 2007, but asked for the afternoon off "to pick his son up or something." Mr. Martin refused Defendant's request, explaining that everyone had to work through the weekend to finish the project. After making a phone call a short time later, Defendant handed another supervisor "a piece of notebook paper or piece of napkin" on which Defendant had written his resignation. Defendant left, and Mr. Martin never saw him again.

Pamela Nockard, landlord and next-door-neighbor of the victim and Defendant, also testified for the prosecution. Defendant and the victim had been Ms. Nockard's tenants and neighbors for about a year prior to the victim's disappearance. Ms. Nockard and the victim also worked together for a time, but the victim had been fired "right before she c[a]me up missing" because of an alcohol problem. Ms. Nockard last saw the victim at her home about two weeks before Thanksgiving 2007. Ms. Nockard had never seen the victim with a male companion.

Shortly after Thanksgiving, Ms. Nockard recalled Defendant moving a barrel "to the front of the house" and burning "stuff in it just about every night." Defendant had another barrel in the backyard "dog pen burning like he was trying to keep the dogs warm." Ms. Nockard said the burning continued "just about every night" for the rest of November and into December 2007. She initially thought Defendant was burning garbage, but noticed a "horrific odor" that smelled like burning rubber and lasted for a couple of days.

Ms. Nockard recalled that Defendant paid the December 2007 rent. Although the victim had always previously paid the rent, Ms. Nockard thought nothing of the change because she knew the victim had recently lost her job. When Defendant returned to pay the rent for January 2008, Ms. Nockard asked if his family had a good Christmas. Defendant replied that his family had a great Christmas and assured Ms. Nockard the victim was "fine."

Detective Grooms testified, describing Defendant's arrest, the search of his residence, and his first interrogation. According to Detective Grooms, Defendant did not appear to have been intoxicated or overly tired at the time of the first interview. Defendant's entire one-hundred-page first statement was then read to the jury. Detective Grooms recalled that after giving his statement in the early morning hours of January 25, 2008, Defendant "voluntarily agreed" to direct the police "to where he buried his mother." Defendant's second, thirty-page statement was then read to the jury in its entirety.

The State also called Dr. Miguel Laboy as a witness. Dr. Laboy, a forensic pathologist, performed the autopsy of what remained of the victim's body, namely the thorax and abdomen, together with several bones and bone fragments from the extremities. When Dr. Laboy received the victim's remains, the body was nude and covered with mud, branches, and leaves. Bones and bone fragments had been cut, charred, and removed from the soft tissue. No head was found. Except for one thigh, the limbs had been severed from the torso. Dr. Laboy prepared a large diagram for the jury showing what parts of the body were recovered. Dr. Laboy found ten to twelve rib fractures on the right side of the victim's body, comparable to fractures sustained in a car accident. Although Dr. Laboy did not observe any bruising on the victim's body, he testified that decomposition may have masked bruising. Dr. Laboy could not determine whether the victim consumed alcohol prior to her death or whether the injuries to her body were inflicted before or after death. Based on his examination of the corpse, together with the information he learned from the police regarding the case, Dr. Laboy concluded that "the cause of death is undetermined type of violence and the manner of death is homicide." Dr. Laboy characterized the dismemberment, burning, and destruction of the victim's head, hands, and feet as indicative of an attempt to destroy or conceal fatal injuries and defensive wounds, which are often located on a homicide victim's head, neck, and extremities.

Dr. Steve Symes, a forensic anthropologist, also testified for the prosecution at trial. Dr. Symes received and studied certain bones from the victim's body[9] to determine the types of trauma that had been applied to the bones. Dr. Symes showed the jury numerous highly magnified pictures of various bones to highlight different traumas. He testified in some detail how several bones showed distinctive marks from various classes of tools. Reading from his report, Dr. Symes opined: "This body has numerous examples of dismemberment in the form of saw cuts to the limbs and neck. The saw used may be a power saw. There is unexpected trauma in the form of a serrated knife, a non[-]serrated (chopping) blade, blunt force trauma." He conceded that some of the markings could have occurred during the

---

[9] Dr. Symes testified that he received "one neck vertebra, cervical vertebra, parts of the right and left forearms, the upper arms, parts of the legs, a little bit of the pelvis and both shin bones, the tibia."

autopsy. Dr. Symes also noted that the bones exhibited numerous superficial burns. Dr. Symes could not determine whether any of the trauma had occurred prior to death.

Michael Smith and Robert Powell, who shared a jail cell with Defendant for about a week during March 2008, also testified for the prosecution. Mr. Smith testified that Defendant always denied killing the victim but gave various accounts of how she died. On one occasion, Defendant said that he found her dead in the bathroom and that "he picked her up and turned her upside down, got all the vomit out of her and then she died in the bedroom." Defendant mentioned the victim's death "every day" during the time he and Mr. Smith were housed together and consistently said that he found the victim drunk Thanksgiving weekend, "got rough with her that night and smacked her around her face."

According to Mr. Smith, Defendant became enraged one night and "threatened to kill [his cellmates], threatened to snap our necks and stack our bodies on top of each other in a pile." During that same incident, Defendant allegedly said, "I'll bash your head in like I did that [expletive] bitch." On cross-examination, counsel for Defendant impeached Mr. Smith's testimony as follows:

> Q. I have a statement that you gave, a handwritten statement.
>
> A. Yeah.
>
> Q. And in that statement you indicated that David Climer, Jr. never admitted to killing his mother. Is that right or wrong?
>
> A. He never said he killed her. He never come out and said I bashed her head in. He didn't come out with those words to say it like that.
>
> Q. Let me show you that I'm not misleading you.
>
> A. I know you're not misleading me. I know what he says. I do know what I heard and I seen his actions and I'm not stupid.
>
> Q. Underlined in that statement in blue ink, can you read that for us, please, sir?
>
> A. "He would always say that he didn't kill her."
>
> Q. Is that right?

A.    He would always say, "I didn't,"

Q.    Stop.  Answer me.  Is that true or not?

A.    Yeah, that's true, except the fact at the very – go on down, right here.
      Yeah, he said, "The last person that made me snap was my mother and
      I crushed her –"

Mr. Smith denied enraging Defendant by stealing his snacks or rummaging through his personal possessions.  Mr. Smith also denied receiving any promises from the State in exchange for his testimony, hinting instead at an altruistic motive: "I worked with his mother at one time.  She was a nice old lady.  It's a shame what happened to her."  Mr. Smith acknowledged he had been convicted of simple possession of marijuana, but described it as "my first offense ever."

Mr. Powell's testimony largely corroborated that of Mr. Smith.  Mr. Powell recalled Defendant saying that he "got a little rough" with the victim while cleaning her up one night after she had become very drunk, put her in bed afterwards, and discovered her dead the next day.  Mr. Powell also recalled Defendant threatening him and Mr. Smith: "I ought to just strip y'all down . . . kill y'all, strip y'all down naked and stack y'all on y'all's bunk."  The last night the trio shared a cell, Mr. Powell recalled Defendant becoming very angry at Mr. Smith for moving his things and saying:  "The last person that pissed me off I bashed their [expletive] head in."

Mr. Powell acknowledged that he was facing charges for aggravated assault and that his lawyer had met with the State to discuss what, if any, consideration could be given in exchange for his testimony.  Mr. Powell denied receiving any promises from the State, however, saying instead: "I needed to get this out, so I told my lawyer."  On cross-examination, Mr. Powell readily agreed that Defendant never admitted killing the victim.

Following Mr. Powell's testimony, the prosecution rested, and counsel for Defendant moved for a judgment of acquittal on the charge of first degree murder, pursuant to Rule 29 of the Tennessee Rules of Criminal Procedure.  Defense counsel did not seek a judgment of acquittal on the second charge, stating: "We recognize the proof has been clear about the abuse of the corpse."  The trial court overruled the defense motion.

Defendant waived his right to testify consistent with Momon v. State, 18 S.W.3d 152, 162-63 (Tenn. 1999).  Defense counsel then called Dr. Robert Kennon, a forensic psychologist, to the stand.  Dr. Kennon opined that Defendant suffered from paranoid personality disorder, from his dependence on alcohol and other drugs, as well as impulse

control disorder. Dr. Kennon, who had met with Defendant on three different occasions for a total of approximately twelve hours, opined that Defendant became delusional when the victim died and could not appreciate the wrongfulness or nature of his conduct at the time he dismembered her body. Defendant admitted to Dr. Kennon that he had abused the victim in the past by hitting her "on the shoulders and the back"—but not the head. Defendant repeatedly denied killing the victim. When informed of Defendant's outbursts as relayed by Mr. Smith and Mr. Powell, Dr. Kennon stated that bravado is typical behavior from persons with impulse control disorder: "They tend to try to come across as somewhat, to get one over on you, to be the top dog." Although Dr. Kennon had not read the transcripts of Defendant's statements, Defendant had confessed much the same conduct to him:

> Q.    Did you know that he completely destroyed her head?
>
> A.    Yes. He indicated that.
>
> Q.    Did you know he burned it in a bucket?
>
> A.    Yes. He indicated he did that.
>
> Q.    Did you know he smashed it with a hammer?
>
> A.    I don't know it was a hammer. He told me that he did incinerate the skull and crushed it and I don't know what with.

Following Dr. Kennon's testimony, the defense rested.

The prosecution called as a rebuttal witness Dr. Samuel Craddock, a forensic psychologist employed at Middle Tennessee Mental Health Institute ("MTMHI"). Defendant spent twenty-seven days at MTMHI for an evaluation from August 19 to September 15, 2009. The description of the victim's death and dismemberment that Defendant gave Dr. Craddock during that time closely tracked the statements he made to Detective Grooms, and Defendant also admitted abusing the victim in the past. Dr. Craddock diagnosed Defendant with low-level chronic depression, but opined that Defendant did not suffer from a severe mental disease or defect and could appreciate the nature or wrongfulness of his conduct when he dismembered the victim's corpse. On cross-examination, Dr. Craddock acknowledged that Defendant never confessed to killing the victim.

The jury convicted Defendant of the charged offenses. On appeal, the Court of Criminal Appeals found the evidence insufficient to support the jury's finding of premeditation. State v. Climer, No. W2010-01667-CCA-R3-CD, 2011 WL 6288140, at *11

(Tenn. Crim. App. Dec. 14, 2011). However, the Court of Criminal Appeals found the evidence sufficient to show intentionality, id. at *12, and modified Defendant's first degree murder conviction to second degree murder.[10] The Court of Criminal Appeals affirmed Defendant's conviction for abuse of a corpse, rejecting Defendant's contention that he established the affirmative defense of insanity by clear and convincing evidence. Climer, 2011 WL 6288140, at *12. The Court of Criminal Appeals also affirmed the trial court's denial of Defendant's motion to suppress, holding that his statements were voluntary and that, even if the statements were elicited in violation of Defendant's constitutional right to counsel, the error in admitting the statements was harmless. Climer, 2011 WL 6288140, at *19-22 (citing Tenn. R. App. P. 36(b)).

We granted Defendant's application for permission to appeal to consider the sole issue of whether the Court of Criminal Appeals erred in affirming the trial court's denial of Defendant's motion to suppress.

**Standard of Review**

On appeal from a trial court's ruling on a motion to suppress, the trial court's findings of fact should be upheld unless the evidence preponderates to the contrary. State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009). The credibility of witnesses, the weight and value of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial judge. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, when the trial court's findings of fact at a suppression hearing are based solely on evidence not requiring credibility determinations, "the rationale underlying a more deferential standard of review is not implicated." State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Such findings of fact are reviewed de novo. State v. Payne, 149 S.W.3d 20, 25 (Tenn. 2004).

Whether an individual's request for counsel is equivocal or unequivocal is a mixed question of law and fact that is ultimately subject to de novo review. State v. Turner, 305 S.W.3d 508, 514 (Tenn. 2010). Our review of the question in this appeal is entirely de novo, with no deference to the trial court's factual findings, because the trial court's factual determinations were based upon the transcripts of Defendant's interrogations, which are included in the record on appeal. See Turner, 305 S.W.3d at 514 (applying de novo review

---

[10] "Second degree murder is [a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2010). "[A] person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-106(a)(20) (2010). "When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." Id. § 39-11-301(a)(2) (2010).

because the trial court's determination was based on video evidence included in the appellate record). Finally, a conviction may be affirmed, notwithstanding a nonstructural constitutional error, if the State proves beyond a reasonable doubt that the error "did not contribute to the verdict obtained." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (internal quotation marks omitted).

**Analysis**

Defendant argues that the trial court erred in denying his motion to suppress because his statements were elicited in violation of his federal and state constitutional right to counsel and were involuntary. Defendant also argues that, although the Court of Criminal Appeals correctly held that his statements were elicited in violation of his right to counsel, the intermediate appellate court erred by concluding that the admission of his statements into evidence was harmless error.

The State responds that Defendant did not invoke his right to counsel; thus, his statements were properly admitted into evidence. Alternatively, even if Defendant's statements were elicited in violation of his right to counsel and improperly admitted, the State contends the Court of Criminal Appeals properly found the error was harmless. The State also contends that Defendant's statements were voluntary. We address each issue in turn.

Right to Counsel

The Fifth Amendment, which applies to the states by virtue of the Fourteenth Amendment, Malloy v. Hogan, 378 U.S. 1, 6 (1964), guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court held that the Fifth Amendment privilege against self-incrimination protects persons "in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." 384 U.S. at 467. The modern practice of police "incommunicado interrogation" in an "unfamiliar" and "police dominated atmosphere," id. at 456-57, the Court explained, entails psychological pressures "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," id. at 467. Consequently, the Court concluded, "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." Id. at 458.

To counteract the inherent compulsion of custodial interrogation, the Miranda Court held that a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right

-23-

to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Id. at 479. Under Miranda, a suspect must be provided an "[o]pportunity to exercise these rights . . . throughout the interrogation." Id. After Miranda warnings are given and an opportunity for exercising the rights afforded, a suspect may "knowingly and intelligently" waive Miranda rights. Id. "But unless and until such warnings and waiver are demonstrated by the prosecution at trial," statements given during custodial interrogation are not admissible in the prosecution's case-in-chief. Id.; see also North Carolina v. Butler, 441 U.S. 369, 373 (1979). If "at any time prior to or during questioning" the suspect invokes his right to remain silent, "the interrogation must cease." Miranda, 384 U.S. at 473-74. Likewise, if the suspect "states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.

Fifteen years after Miranda, the Court in Edwards v. Arizona, 451 U.S. 477 (1981), determined that once a suspect asks for counsel, "additional safeguards" are necessary to protect the Fifth Amendment right against compelled self-incrimination. Id. at 484. Specifically, Edwards announced the following bright-line rule:

> [A suspect], . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484-85. The Court declared: "[I]t is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." Id. at 485. "[W]hen counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present , whether or not the accused has consulted with his attorney." Minnick v. Mississippi, 498 U.S. 146, 153 (1990).

The Edwards rule, a "second layer of prophylaxis for the Miranda right to counsel," McNeil v. Wisconsin, 501 U.S. 171, 176 (1991), recognizes that, once a suspect invokes the right to counsel, "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." Arizona v. Roberson, 486 U.S. 675, 681 (1988) (quoting Miranda, 384 U.S. at 467). "If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, *even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.*" McNeil, 501 U.S. at 177 (emphasis

added). "The Edwards presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of prolonged police custody by repeatedly attempting to question a suspect who previously requested counsel until the suspect is badgered into submission." Maryland v. Shatzer, 559 U.S. 98, __,130 S. Ct. 1213, 1220 (2010) (citations and internal quotation marks omitted).[11]

Tennessee's courts have been applying Miranda for over forty years, see, e.g., State v. Morris, 224 Tenn. 437, 442, 456 S.W.2d 840, 842 (1970); Braden v. State, 534 S.W.2d 657, 660 (Tenn. 1976), and Edwards for over thirty years, see, e.g., State v. Dubrock, 649 S.W.2d 602, 606 (Tenn. Crim. App. 1983); State v. Manus, 632 S.W.2d 137, 139 (Tenn. Ct. App. 1982).

## Invocation of the Right to Counsel

Although Edwards clarified that questioning must cease upon a suspect's invocation of the right to counsel, uncertainty existed for many years as to what constituted an invocation of the right. State v. Saylor, 117 S.W.3d 239, 245 (Tenn. 2003). The United States Supreme Court addressed this issue in 1994 in Davis v. United States, 512 U.S. 452 (1994). The Court declared that "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" Id., at 459 (quoting McNeil, 501 U.S. at 178); accord State v. Huddleston, 924 S.W.2d 666, 669 (Tenn. 1996). "To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry." Davis, 512 U.S. at 458-59. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," questioning need not cease nor must an officer clarify the suspect's intention regarding invocation of the right to counsel. Id., at 459.

> Although a suspect need not speak with the discrimination of an Oxford don he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level

---

[11] The Edwards presumption of involuntariness continues as long as a suspect remains in custody. The presumption ends "once the suspect has been out of custody long enough (14 days) to eliminate its coercive effect," because "[c]onfessions obtained after a 2-week break in custody and a waiver of Miranda rights are most unlikely to be compelled." Shatzer, 130 S. Ct. at 1223.

of clarity, Edwards does not require that the officers stop questioning the suspect.

Id. (citations and internal quotation marks omitted). Applying this standard, the Supreme Court deemed the statement in Davis—"Maybe I should talk to a lawyer"—an equivocal request for counsel that required neither cessation of all questioning nor a clarification of whether Davis was invoking his right to counsel. Id. at 462.

Davis involved an equivocal or ambiguous request for counsel made *after* the suspect waived Miranda rights. Davis, 512 U.S. at 461 ("We therefore hold that, after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney."). The Court in Davis did not address whether the same standard applied to requests for counsel made *before* Miranda rights were waived. This Court initially did not limit Davis to the post-waiver context, but rather applied the Davis standard to determine whether a statement made before a suspect waived his Miranda rights amounted to an invocation of the right to counsel. Saylor, 117 S.W.3d at 246. Other federal and state appellate courts, however, limited Davis to the post-waiver context and held that where a suspect makes an equivocal or ambiguous request for counsel before waiving Miranda rights, subsequent police questioning must be limited to clarifying whether or not the suspect actually wished to invoke his right to counsel.[12] In 2010, this Court reconsidered the question and ultimately relied upon the foregoing authorities to modify Saylor and limit the Davis standard to the post-waiver context. Turner, 305 S.W.3d at 519. Specifically, Turner held that if "a suspect makes an equivocal request for counsel *prior to* waiving Miranda rights, the police are limited to questions intended to clarify the request until the suspect either clearly invokes his right to counsel or waives it." Id. (emphasis added).

Less than three months after Turner, however, the United States Supreme Court decided Berghuis v. Thompkins, 560 U.S. __, 130 S. Ct. 2250 (2010). In Berghuis, a five-to-four decision, the Court applied the Davis standard in the *pre-waiver* context to determine whether a suspect had invoked his Miranda right to remain silent. There, the police brought

---

[12] See United States v. Plugh, 576 F.3d 135, 142-43 (2d Cir. 2009), overruled by United States v. Plugh, 648 F.3d 118, 120 (2d Cir. 2011), cert. denied, __ U.S. __, 132 S. Ct. 1610 (2012); United States v. Rodriguez, 518 F.3d 1072, 1078-79 (9th Cir. 2008); State v. Collins, 937 So. 2d 86, 93 (Ala. Crim. App. 2005); Noyakuk v. State, 127 P.3d 856, 869 (Alaska Ct. App. 2006); Alvarez v. State, 15 So. 3d 738, 745 (Fla. Dist. Ct. App. 2009); State v. Holloway, 760 A.2d 223, 228 (Me. 2000); Freeman v. State, 857 A.2d 557, 572-73 (Md. Ct. Spec. App. 2004), overruled by In re Darryl P., __ A.3d __, 2013 WL 1194949, at *30 (Md. Ct. Spec. App. Mar. 25, 2013); State v. Tuttle, 650 N.W.2d 20, 28 (S.D. 2002); State v. Leyva, 951 P.2d 738, 745 (Utah 1997).

Thompkins, a murder suspect, to the police station and presented him with a <u>Miranda</u>-rights-waiver form.  <u>Id.</u>, at 2256.  At the direction of an officer, Thompkins read the form aloud, verbally confirmed that he understood the listed rights, but declined to sign the waiver.  <u>Id.</u> Thompkins did not say that he wanted to remain silent or that he wanted an attorney, but he remained "[l]argely silent" for the first two hours and forty-five minutes of the interrogation. <u>Id.</u> at 2256-57.  At that point, Thompkins responded "yes" to two questions: "Do you believe in God?" and "Do you pray to God?" <u>Id.</u> at 2257.  Thompkins also answered "yes" when an officer asked "Do you pray to God to forgive you for shooting that boy down." <u>Id.</u> About fifteen minutes later, the interrogation ended after Thompkins refused to make a written confession.  <u>Id.</u>

In his federal habeas corpus proceeding, Thompkins argued that the state courts should have suppressed his incriminating response because he had invoked his Fifth Amendment right to remain silent.  The Supreme Court disagreed, explaining as follows:

> In the context of invoking the <u>Miranda</u> right to counsel, the Court in <u>Davis v. United States</u> held that a suspect must do so unambiguously.  If an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her <u>Miranda</u> rights.

> The Court has not yet stated whether an invocation of the right to remain silent can be ambiguous or equivocal, *but there is no principled reason to adopt different standards for determining when an accused has invoked the <u>Miranda</u> right to remain silent and the <u>Miranda</u> right to counsel at issue in <u>Davis</u>.* Both protect the privilege against compulsory self-incrimination by requiring an interrogation to cease when either right is invoked.

> . . . .

> If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression if they guess wrong.  Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal

activity. Treating an ambiguous or equivocal act, omission, or statement as an invocation of Miranda rights might add marginally to Miranda's goal of dispelling the compulsion inherent in custodial interrogation. But as Miranda holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.

Berghuis, 130 S. Ct. at 2259-60 (emphasis added) (citations and internal quotation marks omitted).

Applying the Davis standard, the Supreme Court concluded that Thompkins's silence for nearly three hours was not an unambiguous invocation of his right to remain silent. Id. at 2260. The Court explained:

Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning. Here he did neither, so he did not invoke his right to remain silent.

Berghuis, 130 S. Ct. at 2260 (citations and internal quotation marks omitted).

The Court in Berghuis thus applied the Davis standard to determine whether Thompkins had invoked his right to remain silent even though Thompkins had not previously waived his Miranda rights. Although the majority opinion did not acknowledge this extension of the Davis standard to the pre-waiver context, the dissenting opinion did.

[T]he suspect's equivocal reference to a lawyer in Davis occurred only *after* he had given express oral and written waivers of his rights. Davis' holding is explicitly predicated on that fact. The Court ignores this aspect of Davis, as well as the decisions of numerous federal and state courts declining to apply a clear-statement rule when a suspect has not previously given an express waiver of rights.

Berghuis, 130 S. Ct. at 2275 (Sotomayor, J., dissenting) (citation omitted).

Commentators have agreed with the dissenting opinion's characterization and also view the majority opinion in Berghuis as standing for the proposition that the Davis standard

-28-

applies in both the pre-waiver and post-waiver contexts. See Wayne R. LaFave et al., 2 Criminal Procedure § 6.9(g) n.185 (3d ed. Supp. 2012-2013) ("[T]he majority [in Berghuis] (as the dissent put it) ignores the fact that the Davis holding was explicitly predicated on the fact that the equivocal reference in that case occurred only *after* defendant had waived his Miranda rights . . . . Thus, it is now clear that Davis also applies where a court evaluates an initial rather than subsequent invocation." (citations and internal quotation marks omitted)); Kit Kinports, The Supreme Court's Love-Hate Relationship with Miranda, 101 J. Crim. L. & Criminology 375, 409 (Spring 2011) ("The second step of [Berghuis's] invocation analysis was an implicit one: the Court silently assumed that Davis applies in cases where suspects did not initially waive their [Miranda] rights.").

Additionally, since Berghuis, a number of the decisions relied upon in Turner as support for limiting Davis to the post-waiver context have been overruled, and Davis has been applied in those jurisdictions in the pre-waiver context. See United States v. Ohene, 698 F.3d 119, 123 (2d Cir. 2012) (stating that Plugh, 576 F.3d at 142-43 is no longer "good law"); United States v. Plugh, 648 F.3d 118, 128 (2d. Cir. 2011) (overruling Plugh, 576 F.3d at 142-43), cert. denied, __ U.S. __, 132 S. Ct. 1610 (2012); Wimbish v. State, 29 A.3d 635, 643 & n.8 (Md. Ct. Spec. App. 2011) (discussing Berghuis and describing Freeman, 857 A.2d at 572-73, which limited Davis to the post-waiver context, as "no longer viable"); In re Darryl P., __ A.3d at __, 2013 WL 1194949, at *30 (overruling Freeman, 857 A.2d at 572-73).

Additionally, other federal and state courts have cited Berghuis and applied the Davis standard in both the pre-waiver and post-waiver contexts. See, e.g., United States v. Scott, 693 F.3d 715, 718 (6th Cir. 2012) (citing Berghuis and applying the Davis standard in the pre-waiver context); United States v. Wysinger, 683 F.3d 784, 794-95 (7th Cir. 2012) (same); Carr v. State, 934 N.E.2d 1096, 1102 (Ind. 2010) (same). At least one state supreme court, while recognizing that Berghuis extended Davis to the pre-waiver context, has refused to follow Berghuis on state law grounds and still limits Davis to the post-waiver context. See Commonwealth v. Clarke, 960 N.E.2d 306, 350-51 (Mass. 2012).

In this appeal, Defendant has generally averred a violation of his right to counsel under both the federal and state constitutions, but Defendant has not contended that his state constitutional right to counsel differs from that provided by the Fifth Amendment. Article I, section 9 of the Tennessee Constitution provides that "the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. We have recognized that article I, section 9 provides a right to counsel "during police-initiated custodial interrogation." Saylor, 117 S.W.3d at 244. We have also acknowledged that article I, section

9 may apply more broadly than the Fifth Amendment in some circumstances,[13] but we have expressly held that a suspect's "invocation of his or her right to counsel is not one of those circumstances." Turner, 305 S.W.3d at 517 (citing Saylor, 117 S.W.3d at 246). To the contrary, "[t]he standard for a valid invocation of the right to counsel is the same under both [a]rticle I, [s]ection 9 and the Fifth Amendment." Saylor, 117 S.W.3d at 246. In light of Berghuis and our own prior decisions, we now conclude that, when determining whether a suspect has invoked the right to counsel guaranteed by the Fifth Amendment and article I, section 9, Tennessee courts must apply the Davis standard, regardless of the timing of the suspect's alleged invocation of the right.[14] The pre-waiver/post-waiver distinction drawn in Turner has been abrogated by Berghuis.

## Equivocal or Unequivocal Request for Counsel

The record shows that Defendant received Miranda warnings before each of the custodial interrogations by Detective Grooms. See Miranda, 384 U.S. at 444 (stating that "custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"); Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980) (holding that "interrogation" for purposes of Miranda means "express questioning or its functional equivalent," including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect"); accord Turner, 305 S.W.3d at 515; State v. Northern, 262 S.W.3d 741, 750-51 (Tenn. 2008). The disputed issue is whether Defendant unequivocally invoked his right to counsel, as required by the Davis standard.

Defendant claims that he invoked his right to counsel three times during the first interrogation. The first invocation occurred, Defendant claims, during the following exchange that appears on the first page of the one-hundred-page transcript, and which

---

[13] See, e.g., State v. Smith, 834 S.W.2d 915, 919 (Tenn. 1992) (disagreeing with Oregon v. Elstad, 470 U.S. 298 (1985), and holding that under article I, section 9, an initial unwarned confession raises a rebuttable presumption that a subsequent confession "even if preceded by proper Miranda warnings, is tainted by the initial illegality").

[14] Although police need not cease questioning until and unless a suspect unequivocally invokes the right to counsel, we agree with the United States Supreme Court that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not [the suspect] actually wants an attorney." Davis, 512 U.S. at 461. Clarifying equivocal or ambiguous statements will "help protect the rights of the suspect by ensuring that he gets an attorney if he wants one and will minimize the chance of a confession being suppressed" in a subsequent judicial proceeding. Id.

occurred immediately after Detective Grooms read Defendant the <u>Miranda</u> warnings and allowed him to review the rights-waiver form.

Defendant:           Well I can't afford a lawyer I can tell you that.

Detective Grooms:    Okay.  I just read it to you, if you can't afford a one, one will be appointed to you.  Okay UH you want to look this over before your sign it and by signing this you are not admitting to anything.  You are just saying that you want to talk to me.

Defendant:           I don't really have anything to say I mean I don't know.

Detective Grooms:    Okay.  I mean do you want to talk to me to see what I got to say to see what you have to say?

Defendant:           Well, I want to hear what you got to say.

Detective Grooms:    OK then if you don't mind look that over.  You want to look that over before you sign it?  You welcome to.

Defendant:           *You mean I can have an uh an appointed lawyer right now?*

Detective Grooms:    Well, not at this time.

(Emphasis added.)

Defendant claims the second invocation occurred during the following exchange, which appears on page thirty-one of the transcript:

Defendant:           Here's the deal uh, from the way you talk to me uh, I don't think you believe me, if I was to say anything to you.  Any kind of story . . .

Detective Grooms:    And I, and I told you tell me, tell me.

Defendant:           *I'm scared to without an attorney here.*

Detective Grooms:    I'm here, well uh . . .

-31-

| Defendant: | I'm just telling you I'm scared to, you know |
| --- | --- |

(Emphasis added.)

Finally, Defendant alleges the third invocation occurred during the following exchange, which appears on page thirty-five of the transcript:

| Detective Grooms: | look, listen to me. I'll sit here and talk to you for a week if you want me to. If it helps you, I will sit here and talk to you. |
| --- | --- |
| Defendant: | But inevitably I'll have to go back there. And go to jail and go to prison probably and this and that you know . . . |
| Detective Grooms: | You don't know that . . . |
| Defendant: | *I can't afford a lawyer.* |
| Detective Grooms: | You don't know that, David . . . |

(Emphasis added.)

We agree with the trial court and Court of Criminal Appeals that Defendant never unequivocally invoked his right to counsel. See Climer, 2011 WL 6288140, at *21. To reiterate, an unequivocal invocation requires a suspect to "articulate his desire to have counsel present sufficiently clearly that a reasonable officer in the circumstances would understand the statement to be a request for an attorney." Davis, 512 U.S. at 459; Turner, 305 S.W.3d at 516; Saylor, 117 S.W.3d at 246. Questions that merely probe the parameters of Miranda rights are properly characterized as "equivocal statements made by a person who is still in the decision making process." Saylor, 117 S.W.3d at 246. Defendant's questions about and references to counsel resemble the statements in Davis, Turner, and Saylor, all of which were determined to be equivocal or ambiguous requests for counsel. See Davis, 512 U.S. at 462 ("Maybe I should talk to a lawyer."); Turner, 305 S.W.3d at 511, 520 ("Um, how quick will my lawyer get here?"); Saylor, 117 S.W.3d at 243-44 ("Well . . . I guess it don't matter until I can get a lawyer present."; "I'm supposed to have a lawyer though, don't I?"; "I have to have a lawyer present, I reckon. Before you ask me. That's the story, isn't it?"; "You have to have a lawyer present before questioning."; and "I might need a lawyer because somebody might try to accuse me of something I didn't do.").

-32-

Defendant's statements are also very similar to other statements the Court of Criminal Appeals has found to be equivocal or ambiguous. See, e.g., State v. Bell, No. E2008-01499-CCA-R3-CD, 2010 WL 3612751, at *24 (Tenn. Crim. App. Sept. 17, 2010) ("I think I need to talk to a lawyer."); State v. Mitchell, 137 S.W.3d 630, 636-37 (Tenn. Crim. App. 2003) ("Do you think I need a lawyer?"); State v. Sanders, No. M2005-02185-CCA-R3-CD, 2006 WL 3516210, at *8 (Tenn. Crim. App. Dec. 6, 2006) ("I guess I need a lawyer, don't I?"); State v. Ledford, No. E1999-00917-CCA-R3-CD, 2000 WL 1211312, at *9 (Tenn. Crim. App. Aug. 28, 2000) ("Don't I need to talk to a lawyer?"); State v. Young, No. 01C01-9605-CC-00208, 1998 WL 258466, at *12 (Tenn. Crim. App. May 22, 1998) ("I'm sorry, I'm just wondering if I should have a lawyer."); State v. Ake, No. 01C01-9603-CC-00094, 1997 WL 311908, at *2 (Tenn. Crim. App. June 6, 1997) ("I probably need to get a lawyer, don't I?").

Defendant's equivocal statements, like those in the decisions cited above, communicated merely a *potential* desire to consult with counsel and lacked the clarity and definitiveness characteristic of statements deemed unequivocal invocations of the right to counsel. See, e.g., Edwards, 451 U.S. at 479 ("I want an attorney before making a deal."); Turner, 305 S.W.3d at 522 ("Get me a lawyer."); State v. Koffman, 207 S.W.3d 309, 319 (Tenn. Crim. App. 2006) ("I want to call [a judge] and [a federal public defender]."); State v. McCormick, No. E2003-02689-CCA-R9-DD, 2004 WL 2583903, at *11 (Tenn. Crim. App. Nov. 15, 2004) ("I'd be willing to [cooperate], I'd like to have a lawyer at this point."); State v. Tidwell, 775 S.W.2d 379, 387 (Tenn. Crim. App. 1989) ("I'd like to call a lawyer before I discuss that.").

Because Defendant never unequivocally invoked his right to counsel, Detective Grooms was not obligated to cease all questioning immediately, and Defendant's statements were not elicited in violation of his constitutional right to counsel secured by the Fifth Amendment and article I, section 9.

<u>Waiver of Miranda Rights</u>

Our conclusion that Defendant did not invoke his right to counsel, however, does not end the inquiry. "Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together." Smith v. Illinois, 469 U.S. 91, 98 (1984); see also Berghuis, 130 S. Ct. at 2260. "Even absent" a suspect's invocation of Miranda rights, a statement given "during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused '*in fact* knowingly and voluntarily waived [his] rights' when making the statement." Berghuis, 130 S. Ct. at 2260 (quoting Butler, 441 U.S. at 373) (emphasis added). The State bears the burden of establishing "waiver by a preponderance of the evidence." Berghuis, 130 S. Ct. at 2261 (citing Colorado v. Connelly, 479 U.S. 157, 168 (1986)); see also State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).

-33-

A valid waiver "has two distinct dimensions." Moran v. Burbine, 475 U.S. 412, 421 (1986). First, a waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. Second, a waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id.; see also Berghuis, 130 S. Ct. at 2260. "The Constitution does *not* require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." Colorado v. Spring, 479 U.S. 564, 574 (1987) (emphasis added). "Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Moran, 475 U.S. at 421 (internal quotation marks omitted).

While the State must show a knowing and voluntary waiver, an express waiver is not required. Berghuis, 130 S. Ct. at 2261; State v. Robinson, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980) ("Lack of an explicit written waiver of the right to remain silent or the right to counsel after Miranda warnings does not per se require exclusion of a confession if waiver can be found from facts and surrounding circumstances."); Bowling v. State, 458 S.W.2d 639, 641 (Tenn. Crim. App. 1970) (recognizing that the State may carry its burden of proving a knowing and voluntary waiver of Miranda rights without showing that the suspect expressly waived his rights). "[G]iven the practical constraints and necessities of interrogation and the fact that Miranda's main protection lies in advising defendants of their rights," Miranda rights may be "waived through means less formal than a typical waiver on the record in a courtroom." Berghuis, 130 S. Ct. at 2262 (citations omitted).

Although implicit waivers are valid, an implicit waiver is not established by showing *only* that Miranda warnings were given before the accused made an uncoerced statement. Berghuis, 130 S.Ct. at 2261 (citing Miranda, 384 U.S. at 475). "The prosecution must make the additional showing that the accused understood these rights." Id., at 2261. "As a general proposition, the law can presume that an individual who, *with a full understanding* of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." Id., at 2262 (emphasis added); see also Mays v. State, 495 S.W.2d 833, 836 (Tenn. Crim. App. 1972) ("The rule is that once a defendant has been informed of his rights and indicates he understands them, his choosing to speak and not requesting a lawyer is sufficient evidence that he knows his rights and chooses not to exercise them."); Bowling, 458 S.W.2d at 641 (same). Thus, the State may establish an implicit waiver of Miranda rights by showing that the suspect received and understood Miranda warnings, did not invoke Miranda rights, and gave an uncoerced statement to the police. Berghuis, 130 S. Ct. at 2264 (finding an implied waiver of the right to remain silent because Thompkins did not invoke his right to remain silent and, "[u]nderstanding his rights in full, he waived his right to remain silent by making a voluntary statement to the police").

-34-

The record in this case contains no evidence that Defendant expressly waived his Miranda rights. Defendant twice refused to sign the rights-waiver form and did not verbally waive his Miranda rights at any time during these lengthy interrogations. Rather, he merely acknowledged that Detective Grooms had advised him of his Miranda rights and stated that he understood his rights.

The State asserts that the record establishes an implicit waiver because Defendant received Miranda warnings, acknowledged an understanding of his rights, and continued to speak with Detective Grooms. We agree with the State that Defendant's refusal to sign the rights-waiver form, standing alone, does not preclude a finding of implicit waiver. Butler, 441 U.S. at 371, 374-75; Huddleston, 924 S.W.2d at 670; Hackney v. State 551 S.W.2d 335, 337 (Tenn. Crim. App. 1977). The problem with the State's argument is that the totality of the circumstances fails to establish that Defendant *in fact* understood his Miranda right to appointed counsel.

At the beginning of the interrogation, Defendant stated that he could not afford an attorney. After reviewing the rights-waiver form, Defendant stated, "You mean I can have an uh an appointed lawyer right now?" When Detective Grooms responded, "Well, not at this time," Defendant continued speaking with him, but avoided answering questions about his mother's death, saying, "I'm scared to without an attorney here." A short time later when Detective Grooms again urged Defendant to talk about his mother's death, the following exchange occurred:

Defendant:              I can't afford a lawyer.

Detective Grooms:  You don't know that, David . . .

Defendant:              I walked in here with everything thing I had in the world, today, you know.

Detective Grooms:  Why?

Defendant:              That's just cause that's all I had . . .

Detective Grooms:  OK . . .

Defendant:              I hadn't worked in a while . . .

Detective Grooms:  How much money did you have in your pocket?

Defendant:          $900

Detective Grooms:   $900. You had $900 and something in your pocket? You got a lot more money than I got.

Although Defendant professed an understanding of his <u>Miranda</u> rights, his statements demonstrate just the opposite with regard to his right to appointed counsel. Defendant's lack of understanding about his right to appointed counsel was exacerbated by Detective Grooms's responses to Defendant's statements and questions. By replying that Defendant could "not at this time" have an appointed lawyer and by discussing the funds Defendant had available to hire a lawyer, Detective Grooms reinforced, perhaps unwittingly, Defendant's confusion about his right to appointed counsel. Considering the totality of the circumstances, we conclude that the State failed to prove by a preponderance of the evidence that Defendant in fact understood his right to appointed counsel, thus precluding a finding that Defendant implicitly waived his <u>Miranda</u> rights. <u>See</u> <u>Commonwealth v. Hoyt</u>, 958 N.E.2d 834, 844-45 (Mass. 2011) (holding that the State could not meet its burden of proving a valid waiver of <u>Miranda</u> rights because the defendant did not understand his right to appointed counsel). Accordingly, Defendant's statements to Detective Grooms should have been suppressed and not admitted at trial.[15]

<u>Miranda Violation and Physical Evidence</u>

Before determining whether the erroneous admission of Defendant's statements was harmless, as the Court of Criminal Appeals found, we must determine whether the physical evidence discovered as a result of Defendant's statements also must be suppressed, given the <u>Miranda</u> violation.

In his motion to suppress, Defendant asserted that his statements and the "fruit of those statements" should be suppressed. Although Defendant did not more specifically

---

[15] The Sixth Amendment right to counsel attaches after the adversarial judicial process has begun. <u>United States v. Gouveia</u>, 467 U.S. 180, 187 (1984). In Tennessee, one means of initiating the adversarial judicial process is issuance of an arrest warrant. <u>State v. Rollins</u>, 188 S.W.3d 553, 565 (Tenn. 2006). According to Detective Grooms, a warrant for Defendant's arrest issued no later than 9:00 a.m. on January 26, 2008, before Defendant's second interrogation at 5:38 p.m. In his brief before this Court, Defendant asserts that the Sixth Amendment right to counsel attaches with the issuance of a *search* warrant. Defendant provides no support for this assertion, and we have found none. Thus, although Defendant's Sixth Amendment right to counsel had attached by the time of his second interrogation, we need not separately address the Sixth Amendment right to counsel in this appeal because the Fifth Amendment right to counsel claim is dispositive.

identify this "fruit," the record indicates that Defendant, who led the police to the victim's body, was referring to the victim's body.[16]

Defendant is mistaken. The "fruit of the poisonous tree" doctrine[17] has not been applied as a remedy for <u>Miranda</u> violations. <u>United States v. Patane</u>, 542 U.S. 630, 642-43 (2004) (plurality opinion); <u>id.</u> at 644-45 (Kennedy, J., concurring). Rather, a violation of <u>Miranda</u> does not require "suppression of the [nontestimonial] physical fruits" of a suspect's otherwise voluntary statements. <u>Id.,</u> at 634 (plurality opinion); <u>id.</u> at 645 (Kennedy, J., concurring) ("Admission of nontestimonial physical fruits . . . does not run the risk of admitting into trial an accused's coerced incriminating statements against himself."). The Fifth Amendment's privilege against self-incrimination is not implicated by the introduction at trial of physical evidence resulting from voluntary statements. <u>Id.,</u> at 643 (plurality opinion). Rather, exclusion of the statements elicited during custodial interrogation "is a complete and sufficient remedy for any perceived <u>Miranda</u> violation." <u>Id.</u> at 641-42 (internal quotation marks omitted).

Similarly, this Court held in <u>State v. Walton</u>, 41 S.W.3d 75, 92 (Tenn. 2001), that nontestimonial evidence discovered as a result of a statement elicited in violation of <u>Miranda</u> must be suppressed "only when the statements are the product of an actual violation of the privilege against self-incrimination, *i.e.,* such as when actual coercion in obtaining the statement is involved or when the invocation of the right to remain silent or to have counsel present is not 'scrupulously honored.'" If a defendant's statement is voluntary, "and not the product of actual coercion or other efforts designed to overcome his will," any "physical evidence recovered as fruit" of the statement need not be suppressed, despite the <u>Miranda</u> violation. <u>Id.</u> at 96. Thus, under both <u>Patane</u> and <u>Walton</u>, the physical evidence discovered as a result of Defendant's statements need not be suppressed unless the statements were not voluntary. We therefore turn our attention to evaluating the voluntariness of Defendant's statements.

---

[16] Defendant asked the trial court to grant an interlocutory appeal from the denial of his suppression motion. The State opposed an interlocutory appeal on the suppression issue, reasoning that an interlocutory appeal would have been appropriate only if the trial court had granted the motion and "the statement had been suppressed and the body had been suppressed." Counsel for Defendant agreed that "if the statement had been suppressed, as we feel like it should have been, then all the evidence is gone. The statement's gone, the body's gone, all that's gone."

[17] <u>Wong Sun v. United States</u>, 371 U.S. 471, 485-86 (1963).

<u>Voluntariness</u>

Prior to <u>Miranda</u>, courts used only the voluntariness test to evaluate the admissibility of confessions. <u>Dickerson v. United States</u>, 530 U.S. 428, 432-33 (2000); <u>Northern</u>, 262 S.W.3d at 748. The voluntariness test, grounded in both the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment, recognizes that coerced confessions are inherently unreliable. <u>Dickerson</u>, 530 U.S. at 433; <u>Northern</u>, 262 S.W.3d at 748. The voluntariness test remains distinct from <u>Miranda</u>. <u>Dickerson</u>, 530 U.S. at 434-35; <u>Mincey v. Arizona</u>, 437 U.S. 385, 397-98 (1978). <u>Miranda</u> asks whether a suspect received certain warnings and knowingly and voluntarily waived certain rights, while the essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion. <u>Dickerson</u>, 530 U.S. at 433-35; <u>State v. Smith</u>, 933 S.W.2d 450, 455 (Tenn. 1996).

A court determining voluntariness must examine the totality of the circumstances surrounding the giving of a confession, "both the characteristics of the accused and the details of the interrogation." <u>Dickerson</u>, 530 U.S. at 434; <u>accord</u> <u>Smith</u>, 933 S.W.2d at 455. Circumstances relevant to this determination include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

<u>Huddleston</u>, 924 S.W.2d at 671 (alteration in original) (emphasis omitted) (quoting <u>People v. Cipriano</u>, 429 N.W.2d 781, 790 (Mich. 1988)); <u>see also</u> <u>State v. Carter</u>, 16 S.W.3d 762, 769 (Tenn. 2000).

Defendant asserts that his statements were involuntary because (1) he was deprived of food, a blanket, and sleep; (2) the first interrogation was lengthy and occurred late at night; and (3) he was in poor emotional and mental health. Defendant did not testify at the suppression hearing, so any evidence supporting his assertion must be gleaned from the

statements themselves, as well as from testimony of the prosecution's witnesses. The transcript demonstrates that Defendant did not complain about the conditions of his confinement until after he had given his first statement. It is true that the first interrogation was lengthy, four or more hours, but much of that time was spent discussing in non-confrontational language completely irrelevant topics—often raised by Defendant. Defendant cried sporadically during the first interrogation and also expressed suicidal thoughts, asking Detective Grooms on several occasions to shoot him. Throughout the interrogation, Detective Grooms exhibited patience and concern for Defendant, even agreeing to care for Defendant's dogs.

Defendant was forty years old at the time of the interrogation, had a high-school education, and three years of college-level course work. Defendant's prior experience with the police consisted of convictions for driving under the influence, misdemeanor theft, possession of marijuana, carrying a weapon onto school property, and two convictions for aggravated assault. The judicial determination of probable cause was not unnecessarily delayed because an arrest warrant was issued less than forty-eight hours after Defendant was taken into custody. Huddleston, 924 S.W.2d at 670, 671-72 (explaining that a judicial determination of probable cause within forty-eight hours of a warrantless arrest is generally considered sufficiently prompt to comply with constitutional standards). Furthermore, Detective Grooms testified that Defendant did not appear to be under the influence of any drug or intoxicant or "overly tired or exhausted." Detective Grooms also stated that Defendant was never physically harmed, threatened with violence, or threatened with the deprivation of food or sleep, and no evidence in the record contradicts this testimony. Chief Deputy Maitland testified that jail policy required providing prisoners, such as Defendant, with food and basic amenities, such as a mattress, blanket, and toilet paper. Chief Deputy Maitland's testimony concerning the procedures applied to inmates on suicide watch also explained why Defendant was not given a blanket following the first interrogation, at which he had repeatedly asked Detective Grooms to shoot him, despite Detective Grooms's assurances that a blanket would be provided.

In summary, the proof does not preponderate against the trial court's finding that no evidence was offered to establish "that [Defendant] was abused as a prisoner or kept under circumstances that would affect his decisions." See Hanning, 296 S.W.3d at 48. Accordingly, we hold that the trial court did not err by rejecting Defendant's claim that his statements were involuntary. Based on this finding, we also conclude that the physical evidence discovered as a result of Defendant's voluntary statements need not be suppressed, despite the Miranda violation.

## Harmless Error Analysis

Having determined that only statements Defendant gave during custodial interrogation should have been suppressed as a result of the <u>Miranda</u> violation, we must next determine whether the erroneous admission of these statements requires reversal of Defendant's convictions. In conducting harmless error analysis, this Court has identified three categories of error: (1) structural constitutional error; (2) non-structural constitutional error; and (3) non-constitutional error. <u>Rodriguez</u>, 254 S.W.3d at 371. Structural constitutional errors involve "defects in the trial mechanism" that "compromise the integrity of the judicial process itself." <u>Id.</u> Because structural constitutional errors "have an impact upon '[t]he entire conduct of the trial from beginning to end,'" they defy harmless error analysis and require automatic reversal. <u>Momon</u>, 18 S.W.3d at 165 (quoting <u>Arizona v. Fulminante</u>, 499 U.S. 279, 309 (1991)).

Non-structural constitutional errors do not require automatic reversal. <u>Rodriguez</u>, 254 S.W.3d at 371. "However, the burden on the State to demonstrate that a non-structural constitutional error is harmless remains quite stringent. The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." <u>Id.</u> The test is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." <u>Id.</u> (internal quotation marks omitted); <u>see also</u> <u>Neder v. United States</u>, 527 U.S. 1, 15 (1999); <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967). The erroneous admission of evidence obtained in violation of a defendant's <u>Miranda</u> rights is a non-structural constitutional error, and as such, is subject to the harmless error analysis described above.[18] <u>Fulminante</u>, 499 U.S. at 292, 295-96 (holding that the admission of a coerced confession is subject to harmless error analysis and recognizing that federal circuit courts of appeal have held that the introduction of statements elicited in violation of <u>Miranda</u> is subject to harmless error analysis); <u>Franklin v. Bradshaw</u>, 545 F.3d 409, 415 (6th Cir. 2008); <u>State v. Bates</u>, 804 S.W.2d 868, 876 (Tenn. 1991); <u>State v. Koffman</u>, 207 S.W.3d 309, 320 (Tenn. Crim. App. 2006).

The State contends that the error in admitting Defendant's statements was harmless because the remaining evidence of Defendant's guilt is "overwhelming." The State relies upon the evidence showing Defendant's concealment of the victim's disappearance from inquiring family members, Defendant's statements to family members that the victim left

---

[18] The Court of Criminal Appeals found that Defendant's statements were erroneously admitted because he invoked his constitutional right to counsel, but apparently used the standard for non-constitutional error to evaluate whether the error was harmless. <u>Climer</u>, 2011 WL 6288140, at *22 (citing Tenn. R. App. P. 36(b)). Identifying the proper standard is important because the standards for evaluating the harmfulness of non-constitutional error and constitutional error differ markedly.

with a man named Ray likely destined for Mexico, Defendant's failure to file a missing person's report, proof that the victim's blood had been found around the home she shared with Defendant and on a box in a storage unit rented by Defendant, the disappearance of most of the victim's belongings from her home, the testimony of Defendant's neighbors about his activities around the time of the victim's disappearance, and the testimony of Defendant's cellmates about the threats he made against them. The State contends that, taken together, "the evidence overwhelmingly showed that the defendant intentionally killed his mother and abused her corpse."

Of course, a guilty verdict may rest entirely on circumstantial evidence, State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011), but the issue here is not whether the remaining admissible evidence presented at trial was sufficient to support Defendant's convictions. Rather, we must determine from the record "whether it appears *beyond a reasonable doubt* that the error complained of did not contribute to the verdict obtained." Rodriguez, 254 S.W.3d at 371 (emphasis added) (internal quotation marks omitted). As the United States Supreme Court has observed: "A confession is like no other evidence." Fulminante, 499 U.S. at 296. "[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." Id. (quoting Bruton v. United States, 391 U.S. 123, 139 (1968) (White, J., dissenting)). This is true because a defendant's admissions "come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct." Id. (quoting Bruton, 391 U.S. at 140 (White, J., dissenting)).

We agree with these observations and find them particularly applicable here, where Defendant's statements were the foundation on which the remaining circumstantial evidence rested. We conclude, after reviewing the record, that the State failed to establish beyond a reasonable doubt that the erroneous admission of Defendant's statements did not contribute to the verdict obtained. Cf. Bates, 804 S.W.2d at 876 (holding harmless the erroneous admission of a confession obtained in violation of defendant's right to counsel where a second confession was admissible). Accordingly, we conclude that the error is not harmless, and Defendant's convictions must be reversed.

The Double Jeopardy Clause[19] bars Defendant's retrial for first degree premeditated murder because the Court of Criminal Appeals reversed his conviction for insufficient evidence, and the State has not appealed that reversal. See State v. Maupin, 859 S.W.2d 313, 317 (Tenn. 1993) ("[W]here a conviction for an offense is reversed on appeal for insufficient

---

[19] U.S. Const. amend. V ("[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ."); Tenn. Const. art. I, § 10 ("[N]o person shall, for the same offence, be twice put in jeopardy of life or limb.").

evidence, double jeopardy protects the accused from retrial on *that* offense, but he may still be tried on lesser offenses if the evidence at the first trial was not insufficient, as a matter of law, to support a conviction of those lesser offenses."). The State is not precluded, however, from again trying Defendant for second degree murder and abuse of a corpse. The State will be precluded at any new trial from introducing Defendant's statements against him in its case-in-chief, although Defendant's voluntary statements will be admissible for impeachment purposes should Defendant take the stand. See Harris v. New York, 401 U.S. 222, 224-26 (1971) (stating that voluntary statements elicited in violation of Miranda are inadmissible in the prosecution's case-in-chief but may be used to impeach a defendant's credibility, "provided of course that the trustworthiness of the evidence satisfies legal standards"); cf. Mincey, 437 U.S. at 398-402 (holding that involuntary statements are inadmissible at trial for all purposes). The physical evidence discovered as a result of Defendant's statements will be admissible in the prosecution's case-in-chief.

Our holding enforcing Miranda and the constitutional rights it secures certainly should not be interpreted as minimizing the murder which may have occurred or the abuse of a corpse, which did occur. Our decision also should not be interpreted as denigrating the efforts of the police officers charged with investigating the victim's disappearance and death. We also recognize that dedicated police officers must work within an ever-evolving array of decisional law with which lawyers and judges struggle to keep pace. We acknowledge that "[t]he pressures on state executive and judicial officers charged with the administration of the criminal law are great, especially when the crime is murder." State v. Dailey, 273 S.W.3d 94, 112 (Tenn. 2009) (quoting Brewer v. Williams, 430 U.S. 387, 406 (1977)). Nonetheless, "it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all." Id. at 112-13.

## Conclusion

We reverse the judgment of the Court of Criminal Appeals on the grounds stated herein, vacate Defendant's convictions, and remand for further proceedings consistent with this opinion. Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE