FILED
09/11/2025
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 12, 2025 Session

## STATE OF TENNESSEE v. GERALD LOVELACE

**Appeal from the Circuit Court for Stewart County**
**No. 2017-CR-155   David D. Wolfe, Judge**
_____

### No. M2024-01205-CCA-R3-CD
_____

The defendant, Gerald Lovelace, was convicted by a Stewart County Circuit Court jury of three counts of first-degree felony murder, which were merged into one conviction and for which the defendant was sentenced to life imprisonment.  On appeal, the defendant argues that: (1) the trial court erred in denying his motion to suppress his statement to law enforcement; (2) his Fourth Amendment right against unreasonable searches and seizures was violated; (3) the trial court erred in allowing witness testimony concerning his prior purchase of drugs from the victim, his "habit" of keeping a gun under the hood of his car, and his being "suited and booted" when he left the house the night of the murder; and (4) the evidence is insufficient to sustain his convictions.  Following a thorough review of the record, the briefs, and oral arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JILL BARTEE AYERS and TOM GREENHOLTZ, JJ., joined.

Stephanie Ritchie Mize, Clarksville, Tennessee (on appeal), and John A. Stephens, Clarksville, Tennessee (at trial), for the appellant, Gerald Lovelace.

Jonathan Skrmetti, Attorney General and Reporter; Elizabeth Evan, Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Joshua Turnbow, Joseph C. Hall, and Erin Danielle Bryson, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## *Facts and Procedural History*

The evidence shows that the victim, Donnie Cooksey, was murdered on June 7, 2016, when individuals entered his home during the night to steal money and/or drugs from him. As a result, the defendant and four co-defendants, Amy Brooke Hankins, Ashley Nicole Hankins, Abdullah Hassan Powell, and John Curtis Perry, Sr. were indicted for murder during the perpetration of or attempt to perpetrate a robbery, murder during the perpetration of or attempt to perpetrate a burglary, and murder during the perpetration of or attempt to perpetrate a theft. The defendant and his co-defendants were also charged with the aggravated burglary of another victim's home that occurred on June 5, 2016. The trial court severed the defendant's trial from the co-defendants' and severed the felony murder charges from the aggravated burglary charge.

## I. Motion to Suppress

Before trial, the defendant filed a motion to suppress his statement to police, asserting that he unequivocally invoked his right to counsel before giving the statement and that his statement was involuntary. The trial court conducted a hearing on the motion on February 12, 2018.

The testimony at the suppression hearing showed that the defendant was taken into custody for questioning pursuant to a search warrant for his DNA and fingerprints on March 27, 2017. Agent Brandt Holt with the Tennessee Bureau of Investigation ("TBI") and a unit from the Clarksville Police Department ("CPD") brought the defendant to the CPD police station around 7:30 p.m., and the defendant was ankle-cuffed to the floor in the interview room around 8:00 p.m. by a CPD officer. Over the course of the ensuing hours, the defendant was questioned by TBI Agent Shawn Adkins, TBI Agent Holt, and Cumberland City Police Department ("CCPD") Chief of Police Jason Gillespie. Agent Adkins, the lead investigator in the case, read the defendant his *Miranda* rights, and the defendant signed a waiver agreeing to speak with the officers. The officers executed the search warrant by obtaining a mouth swab and fingerprints and then began questioning the defendant about the case at 8:37 p.m.

The defendant initially maintained that "he didn't have anything to do with" the victim's murder. However, Agent Adkins did not believe the defendant because "an individual" had identified the defendant from surveillance footage "based on the way he was walking and the way he was dressed," and "the driver of the truck that's in the video from the night [the victim] was murdered . . . provided information also that [the defendant] was there that night." Agent Adkins recalled that "[d]uring the interview[,] [the defendant]

- 2 -

seemed willing to cooperate. At times it appeared that he was going to tell us what I believe would have been the truth, and then he would back off. And he seemed to be concerned about his children, more so than himself."

Agent Adkins recalled that around 1:00 a.m., the defendant asked, "can I have an attorney here to help me through something." Agent Adkins took the defendant's statement to be "asking [his] opinion on legal advice, can I have an attorney here to help me through something," not as a request for a lawyer. Agent Adkins responded, "That having a lawyer present was up to him. That's up to you." Agent Adkins acknowledged that he did not clarify with the defendant whether he was asserting his right to counsel.

Agent Adkins left the interview room at 1:09 a.m. and returned at 2:53 a.m. The charging decision was made during that extended break, and upon returning to the interview room, the officers informed the defendant that he was being charged with felony murder. The defendant asked what would happen if he changed his statement, and Agent Adkins expressed that the only way things would change was if the defendant told the truth and provided something to present to the district attorney. The defendant then provided a differing statement, which Agent Adkins described as "[the defendant's] version of the truth. I still don't believe it's 100 percent the truth." The interview concluded at 4:23 a.m. Thereafter, the defendant was transported to Stewart County Jail for booking, and arrest warrants were obtained from the magistrate around 5:00 a.m. Later that same morning, at 11:36 a.m., the defendant met with Agent Adkins and Chief Gillespie in Cumberland City to help find the weapon the defendant claimed to have discarded. At the site, Agent Adkins reminded the defendant of his *Miranda* rights, but the rights were not specifically recited afresh.

During the course of the interview on the 27th and 28th, the room temperature was mentioned a few times by the defendant, who was dressed in a tank top and pants, and the defendant also told the officers that he was cold-natured. Despite this, Agent Adkins did not remember the defendant ever asking for a blanket or a coat. Agent Adkins did not recall the interview room being cold, noting that Chief Gillespie was wearing a short-sleeved shirt and "it was ambient temperature outside." Agent Adkins explained that he was personally wearing a jacket because he was "cold natured," not because he was cold. Throughout the interview, the defendant was provided with water and bathroom breaks, but the defendant did not request food or for the interview to stop. The defendant did not appear to be -tired or make a statement about needing a break or sleep.

On cross-examination, defense counsel played clips of the defendant's interview for Agent Adkins while he was being questioned. At 9:40 p.m., the defendant asked if he was going to be charged, and Agent Adkins responded, "[W]e ain't charging nobody, we want the stinking truth." On redirect, Agent Adkins explained that the statement was true at that point in time. The video reflected that at 11:02 p.m., Agent Adkins told the defendant, "[Y]ou ain't going to lose your kids by doing the right thing, you understand that?"

However, on redirect, Agent Adkins explained that the rest of his statement was that the defendant's children "would respect him for being honest and telling the truth."

Agent Adkins acknowledged that the video of the interview showed that at 12:48 a.m., Agent Holt went into the interview room and took the defendant's cell phone after seeing the defendant on his phone from the observation room. Agents Holt and Adkins returned to the interview room shortly thereafter and told the defendant that the district attorney wanted to know if the defendant was cooperating. At 1:07 a.m., the defendant expressed that he was cold and that he needed to urinate, but no bathroom break was given at that immediate time. A half-hour later, the defendant knocked on the door to remind the officers that he needed to urinate, and Agent Holt came in and escorted the defendant to the bathroom. Agent Adkins expressed that no questions were asked of the defendant between 1:07 a.m. and the bathroom break. The defendant was then left alone in the interview room until 2:53 a.m. when Agents Adkins and Holt returned informing the defendant that he was being charged with felony murder.

Agent Brandt Holt with the TBI picked up the defendant on a search warrant for DNA and fingerprints and brought him to the CPD. During the period of questioning, Agent Holt escorted the defendant to the bathroom on two or three occasions, removing the ankle-cuff and replacing it after each occasion. Agent Holt told the defendant that he was not personally going to charge him, as he would not have been the one to make such decision. Agent Holt agreed that he told the defendant that he could tell the district attorney that the defendant was truthful, explaining that "[t]he insinuation is that when you do tell the truth and that you are being cooperative you can at least explain to the District Attorney that they are willing to be forthcoming in the information that they have provided concerning the case." The officers simply encouraged the defendant to tell the "truth."

Agent Holt recalled that he wore a short-sleeved shirt during the interview and did not remember the room being cold. Agent Holt said that when he was not physically in the interview room, he observed the interview on the video feed about half of the time. At 12:48 a.m., Agent Holt entered the room and demanded that the defendant hand over his cell phone, having observed the defendant on his phone. There was a significant break from 1:08 a.m. to 2:53 a.m., approximately an hour and forty-five minutes, during which the defendant was in the interview room alone aside for a bathroom break. At various times, the defendant stuck his arms inside his shirt, rubbed his arms, breathed into his hands, and squatted down tucking his arms under his legs. Asked if it was his practice to ignore a suspect who was exhibiting signs of being cold, Agent Holt responded, "No, sir, it's not. Some of the things they also exhibit when they appear to be cold may be also signs of your nerves as a result of being a prisoner." Regardless, the defendant never asked for a blanket, coat, or anything with which to warm himself.

Chief Gillespie said that the interview room was "a little chilly, but not overly cold." Chief Gillespie recalled the defendant saying that the room was cold and asking if the heat

was on. At 10:08 p.m., Chief Gillespie apologized for the room being cold. Chief Gillespie also recalled the defendant making a statement about an attorney, but he took the statement as a question of whether he could have an attorney if he wanted one, not an unequivocal request for an attorney. Asked if the defendant seemed overly tired, Chief Gillespie stated, "I think he was tired. He didn't seem overly tired to me. I think we were all tired." Chief Gillespie assisted in an interview the following day at 11:36 a.m. in Cumberland City.

Deputy Nathan Green, a corrections officer with the Stewart County Detention Center, testified that he started the process of booking the defendant into jail at 5:26 a.m. on March 28, 2017, and that the process typically took twenty minutes to one hour to complete.

After the hearing, the trial court entered an order denying the motion to suppress. In its order, the court determined that the defendant's question regarding an attorney "was very much the type of equivocal, ambiguous reference to a lawyer described by the court in [*State v.*] *Climer*, [400 S.W.3d 537 (Tenn. 2013,] and did not constitute a clear invocation of his right to counsel." With regard to the voluntariness of the defendant's statement, the trial court found that "the totality of the circumstances, the conditions under which the interview was conducted, and the treatment of the defendant did not rise to the level of coercion which would render the wavier of his *Miranda* rights involuntary." The trial court also denied the defendant's application for an interlocutory appeal of the suppression order pursuant to Tennessee Rule of Appellate Procedure 9, and the State proceeded to trial on the three counts of felony murder.

## II. Trial

The proof at trial showed that the fifty-one-year-old victim had three brothers, Christopher, Troy, and Jeff Cooksey.[1] Christopher Cooksey had a child with one of the co-defendants, Ashley Hankins. The defendant had children with another co-defendant, Amy Hankins, the sister of Ashley Hankins.

Samantha Kizer, a family friend of the victim's, visited the victim around 10:00 p.m. the night prior to his death and left around midnight. She received a text from the victim around 1:30 a.m. asking if she had made it to where she was going safely. She did not hear from the victim again and learned that afternoon that he had been murdered.

Anita Stevens was staying at her mother's house, which was catty-corner to the victim's home, the night of the murder and recalled that she was awakened by a loud noise and her dog barking around 2:00 a.m. She looked out the window but saw nothing amiss outside. Later that day, Ms. Stevens saw Troy leaving the victim's home carrying a large bag.

---

[1] Because many individuals involved in this case have the same surname, we will refer to them by first name only at times for brevity and clarity. We intend no disrespect by this practice.

Georgia Cooksey, who is married to the victim's brother Jeff, drove by the victim's house around 7:45 the morning of June 7, 2016, after dropping her children off at her mother-in-law's home up the street from the victim's. She noticed that although the storm door was closed, the front door to the victim's house was open and the ceiling fan light on, which she found odd because the victim was not normally awake at that hour. However, she did not stop because she was running late for an appointment.

Donald Cooksey, the victim's father, testified that he became concerned when he was unable to get in touch with the victim the morning of June 7, 2016, because it was unusual for the victim to not return his calls and they were supposed to travel for a family funeral later that day. Mr. Cooksey talked to the victim's mother, and she said she would ask one of the victim's brothers to go check on him.

Troy Cooksey went to the victim's house around 2:00 p.m. after his mother was unable to reach the victim. Upon his arrival, Troy noticed that the storm door was closed, and the interior door was open, which he found unusual because the victim "always" kept his front door "closed and locked."

As he approached, Troy called out the victim's name but received no response. At that point, Troy looked through the storm door and saw the victim lying on the floor in the living room. Troy ran inside and shook the victim, but the victim was "cold to the touch" and did not move. Troy contacted 911 and waited for help to arrive. He noticed that the victim's house was "a little tore up" and that a pistol was lying next to the victim. Troy acknowledged that the victim sold marijuana and that he removed some of the marijuana from the crime scene. Troy denied taking a duffel bag from the victim's home after finding the body, elaborating that the only time he left the victim's home with a bag was when the victim's daughter gave him a bag of the victim's clothing after she cleaned out the house.

Brandi Burns, the victim's girlfriend and cousin of the victim's sister-in-law, Georgia Cooksey, said that she and the victim were planning to move to Clarksville and that the victim had saved approximately $3,000 in cash for such purpose. Ms. Burns told law enforcement that she saw the victim with the cash just two days before the murder. Ms. Burns acknowledged that the victim sold marijuana but said he only sold to people he knew personally.

Rick Smith, an officer with the CCPD, was the first responder to arrive on the scene after the dispatch call came out at 3:09 p.m. When he entered the house, he found the victim on the floor in the living room covered in blood and a gun lying by the victim's leg. He also noticed drops of what appeared to be blood going down the hallway.

The TBI was called to assist in the investigation, and Agent Adkins arrived at the scene around 5:30 p.m. In conducting a search of the victim's residence, Agent Adkins found cash in the bedroom where it was determined the victim had been shot. Additionally, Agent Adkins discovered marijuana, a white powder substance, and pills in the kitchen.

No suspects were developed immediately, but a "tip" a few months after the murder led Agent Adkins to surveillance footage from an apartment complex near the victim's home. Agent Doug Williams with the TBI technical services unit extracted surveillance video from a DVR submitted to him by Agent Adkins.

The surveillance footage showed a white truck pull into the apartment complex at 1:50 a.m., and at 2:03 a.m., two African-American men walked into the apartment complex and got into the truck. "They s[a]t in the truck for a little bit," and then the driver, identified as co-defendant Perry, and one of the passengers got out of the truck, walked to the front, and raised the hood. The men "st[oo]d[] there for a little bit," closed the hood, and got back into the truck. Soon after, around 2:10 a.m., the two passengers got out and walked "in the general direction of the victim's trailer." The truck pulled away at approximately 2:15 a.m. Agent Adkins recounted that the distance between the truck and the victim's home was approximately 300 feet. Agent Adkins identified co-defendant Perry from the video, and co-defendant Perry told Agent Adkins that the two passengers were the defendant and co-defendant Powell.

Agent Adkins made contact with the defendant "through Amy and Ashley Hankins" about nine months after the murder and interviewed him at the Clarksville Police Department around 8:00 p.m. on March 27, 2017. Agent Adkins testified that in his interview, the defendant told him that he had been to the victim's home once before with Amy to buy drugs. Defense counsel objected to the testimony as a prior bad act. The court ruled the testimony was admissible to establish the defendant's connection to the victim but that it would provide a limiting instruction to the jury that such testimony was allowed "solely to establish a connection in the State's theory between the defendant and the victim in the case."

Agent Adkins continued to recount his interview with the defendant. The defendant initially denied being in co-defendant Perry's white truck, going to Cumberland City, or ever having a gun. After the officers explained that he was going to be charged with felony murder, the defendant admitted that he was in the truck near the victim's home just before the murder. The defendant told the officers that he had "discreetly discarded the magazine in hopes that he could somehow get out of doing this act." However, the officers did not believe the defendant to be entirely truthful; specifically questioning the defendant's repeated claim to have "walked" from the crime scene back to his home over 20 miles away. The interview concluded at 4:23 a.m.

Later in the morning after the defendant was booked into the Stewart County Jail, at 11:36 a.m., the defendant went with law enforcement to the location where he said he discarded the magazine and firearm. No magazine or firearm was ever found at the location. Officers also recorded this interview with the defendant, during which the defendant told the officers that he got back in the truck with co-defendants Perry and Powell following the murder, and they went to Clarksville to co-defendant Powell's house.

Former TBI firearms examiner Kevin Warner responded to the scene as a member of the violent crime response team. Based on his observations, Mr. Warner surmised that the victim was shot while in his bed but had managed to make his way down the hallway and into the living room where he succumbed to his injuries. Mr. Warner observed that the front door deadbolt "had been damaged."

TBI Agent Shelly Betts testified as an expert in firearms and tool mark examination. Agent Betts examined the bullet recovered from the victim during autopsy and determined it was nine millimeters in caliber. She also determined that the cartridge casing found in the victim's bedroom was the same caliber. Agent Betts tested the firearm found next to the victim against the bullet and casing and determined it was not the firearm used to kill the victim.

TBI Agent Miranda Gaddes testified as an expert in microanalysis regarding her examination of shoe impressions, tire impressions, and a vehicle as part of the investigation in the case. TBI Agent Lisa Burgee, an expert in forensic biology, analyzed multiple items of evidence for blood and touch DNA and was unable to conclusively link the defendant to any of the evidence she tested. TBI Agent Lela Jackson testified as an expert in forensic chemistry that she determined the "plant material" recovered from the victim's home was marijuana, a white powder substance found in the victim's home was cocaine, and some blue pills found in the victim's home were diazepam. TBI Agent Lucas Riley[2] testified as an expert in latent print examination that he lifted prints from numerous surfaces and items at the crime scene, as well as from two vehicles – a Lexus sedan and a Chevrolet truck. Agent Riley lifted no prints matching the defendant.

The trial court held a jury-out hearing regarding the admissibility of certain testimony from co-defendant Amy Hankins before she was called to testify. The trial court ruled that Amy's testimony regarding an attempted burglary two nights earlier was admissible to show motive, intent, and lack of mistake on the defendant's part. The court also said that it would allow Amy to testify that the defendant and co-defendant Powell left the house "suited and booted" because she could explain that "simply means they were dressed in black and carrying a weapon." The court further ruled that it would allow Amy to testify that the defendant "normally kept a round in the chamber of whatever gun he was carrying and he always carried a gun under the hood of his car" because it would rebut the defendant's statement that he did not know if the gun he possessed had a round in the chamber. The court excluded as more prejudicial than probative testimony that the defendant stole guns a few days before the murder, statements of other co-defendants, and references to the defendant's past criminal history.

Amy Hankins was then called to testify in front of the jury, during which she first acknowledged that she pled guilty to facilitation to commit second-degree murder and was

---

[2] As the time of trial, Agent Riley was employed at the Federal Bureau of Investigation.

serving an eight-year sentence due to her involvement. Amy explained that her sister, Ashley, came up with the plan to rob the victim. Ashley had been romantically involved with the victim's brother, Christopher, for thirteen years and was very familiar with the victim's home.

According to Amy, the defendant told her that two days before the victim's murder the defendant and co-defendant Powell "accidentally went into the wrong house. They was looking for [the victim]'s house and went into the wrong house." When they realized it was the wrong house, the defendant left, but co-defendant Powell "searched a little bit." The defendant told Amy that the house belonged to "an elderly white lady" and "that they left a crowbar under the window, and he thinks he lost his bandana out there."

Thereafter, on the night of the murder, around 11:00 p.m. or midnight, Amy, the defendant, and co-defendants Powell and Perry went to Amy's and the defendant's home after spending time at co-defendant Powell's house. Amy explained that "[i]t was very known what was going to happen that night." Amy and the defendant went inside, where the defendant changed into dark clothing, and co-defendants Powell and Perry stayed outside. Amy described that the men were dressed "[i]n dark clothes ready to go do . . . the robbery." While they were inside, the defendant told Amy that he did not want to participate in the robbery, but Amy "pushed him to go" because they "needed the money."

Amy stayed home with the children, and the men left in co-defendant Perry's white truck. Co-defendant Powell and the defendant both had weapons, respectively a .45 caliber and a 9mm. Before they left, Amy saw the men place their firearms under the hood of co-defendant Perry's truck. Amy explained that they placed the weapons under the hood because "[t]hat way if they get pulled over or something. . . [n]ormally police don't check under the hood for weapons." Amy had seen the defendant place a weapon under the hood of their vehicle "on occasions" for "protection."

The next time Amy heard from the defendant was between 2:00 and 3:00 a.m. when he called her from co-defendant Perry's phone after the men had left the victim's house. The defendant told Amy that "they went in and they didn't get anything, and that he had to shoot but he didn't think that [the victim] got shot." The defendant specified to her that "he just went right past the door" and was looking for a light switch "when he heard the shot, and then he ran out." The defendant told Amy that he "intentionally" lost the "clip" of his firearm, and he put co-defendant Powell's weapon "at a car wash off of Lafayette Road [in Clarksville] the next day." Amy said that the defendant did not tell her whether he removed a bullet from the chamber of his firearm when he "lost" his "clip," but that the defendant normally checked the chamber for a bullet before putting his gun away.

On cross-examination, Amy admitted that while she was in jail in Montgomery County, she spoke to co-defendant Powell's ex-girlfriend, Ms. Youngblood, and may have told Ms. Youngblood "that none of us was involved just because, you know, I'm going to

claim my innocence before I know that they know I'm guilty." Amy acknowledged that she received a sentence of eight years in exchange for agreeing to testify against the other co-defendants. Amy admitted that she initially lied to the police about all co-defendants' involvement because she "wanted us all to get off."

Wanda Gilliam testified that she lived in the same neighborhood as the victim, and her house was burglarized two days before the victim's murder. Around 1:30 to 2:00 a.m., Ms. Gilliam was asleep in the living room when she was awakened by her dog barking. She saw a man dressed in black with gloves and a face covering walk from her bedroom into the living room and towards the front door. The man opened the door and turned around, so Ms. Gilliam asked him what he wanted. The man responded that he was looking for his dog, to which Ms. Gilliam replied that the only dog in the house belonged to her. Ms. Gilliam continued, "Just after a while, after the man ransacked my bedroom and stuff, I kept hearing somebody at the door saying, come on, bro, let's go." The man came back into the living room and asked Ms. Gilliam what was behind a curtain, and "he went back there for maybe five minutes and come back out." Ms. Gilliam called the police, and Officer Rick Smith responded to the call. He found a crowbar outside Ms. Gilliam's bathroom window, which was determined to be the point of entry, and a "scarf" and a shell casing inside her home. Ms. Gilliam did not own a firearm. Officer Smith estimated that the distance between Ms. Gilliam's home and the victim's was "a city block" and that the two homes looked "very similar" on the exterior.

Medical Examiner Erin Carney performed an autopsy on the victim and determined that the cause of death was a gunshot wound to the chest and manner of death was homicide.

Following the conclusion of the proof, the jury convicted the defendant as charged of three counts of felony murder. The trial court merged the convictions into a single count and imposed a sentence of life imprisonment. The defendant appealed.

### Analysis

On appeal, the defendant argues that: (1) the trial court erred in denying his motion to suppress his statement to law enforcement; (2) his Fourth Amendment right against unreasonable searches and seizures was violated; (3) the trial court erred in allowing witness testimony concerning his prior purchase of drugs from the victim, his "habit" of keeping a gun under the hood of his car, and his being "suited and booted" when he left the house the night of the murder; and (4) the evidence is insufficient to sustain his convictions.

## I. Motion to Suppress

The defendant argues that the trial court erred in denying his motion to suppress his statement to police because it was given after he invoked his right to counsel and was

involuntary due to coercion by the police. The State responds that the trial court properly admitted the defendant's statement. We agree with the State.

Suppression issues on appeal are subject to well-established standards of review. Appellate courts are bound by a trial court's findings of fact determined after a suppression hearing unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2 (Tenn. Crim. App. Sept. 13, 2012). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Appellate courts should consider the entire record, affording the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence." *McGee*, 2012 WL 4017776, at *2 (citing *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001)); *see also State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). However, applying the law to the factual findings of the trial court is a question of law, which is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

## A. Right to Counsel

The defendant argues that his statement should have been suppressed because it was given after he "unequivocally and unambiguously invoked his right to counsel." The State responds that the defendant "did not unequivocally invoke his right to counsel"; therefore, the trial court properly admitted his statement. We agree with the State.

The Fifth Amendment to the United States Constitution, applicable to states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. If a suspect is in police custody "or otherwise [has been] deprived of his freedom of action in any significant way," the police must first inform him of his Fifth Amendment rights for any subsequent confession to later be admissible as substantive evidence. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In this regard, the United States Supreme Court has said, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* These rights may be voluntarily, knowingly, and intelligently waived. *Id.*

Whether or not an accused has invoked his right to counsel during interrogation is an "objective inquiry." *Davis v. United States*, 512 U.S. 452, 459 (1994). "The accused 'must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer . . . would understand the statement to be a request for an attorney.'" *State v. Saylor*, 117 S.W.3d 239, 245 (Tenn. 2003) (citing *State v. Huddleston*, 924 S.W.2d 666,

670 (Tenn. 1996)). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," questioning need not cease, nor must an officer clarify the suspect's intention regarding invocation of the right to counsel. *Davis*, 512 U.S. at 459. "Questions that merely probe the parameters of *Miranda* rights are properly characterized as 'equivocal statements made by a person who is still in the decision making process.'" *State v. Climer*, 400 S.W.3d 537, 563 (Tenn. 2013) (quoting *Saylor*, 117 S.W.3d at 246)). "Whether an individual's request for counsel is equivocal or unequivocal is a mixed question of law and fact that is ultimately subject to de novo review." *Climer*, 400 S.W.3d at 556.

The 205-page transcript of the defendant's interview with the police reveals that the statements regarding an attorney came up during the following exchange:

Q:      . . . And I know you're scared and I know you're worried about a lot of stuff, all right but you got to get all that behind you and you get all that behind you by telling the dang truth.

A:      *Can I just have my lawyer with me that way that can help me out, maybe what the f\*ck I need to be doing?*

Q:      All right. That's up to you. Only thing – only thing I need is I need the dang truth, Gerald.

A:      It's like I've – I've been sitting up here trying to, you know, give you everything that I know. I don't really know sh\*t. Not about no murder or nothing like that.

Q:      I don't need to know what you know from being there. Because, like I say, we're beyond – we're beyond if you were there. You were there. And we know you were there and you know you were there. All right? All I need to know is what happened after you go there. What happened, what did you see, what did you hear going down?

A:      *F\*ck, I don't like this. It's 1 o'clock. I'm never having to consult my attorney, that's what I never had any – I didn't have the need for this.*

Q:      Do what?

A:      *I said I didn't consult with my attorney because I felt like I didn't need to.*

At the suppression hearing, Agent Adkins testified that he took the defendant's statement about an attorney to be "asking [his] opinion on legal advice, can I have an attorney here to help me through something," not as a request for a lawyer. Similarly, Chief Gillespie also recalled the defendant making a statement about an attorney, but he

- 12 -

took the statement as a question of whether he could have an attorney if he wanted one, not an unequivocal request for an attorney.

Upon our review, we determine that the defendant's statements, here, are in the same vein as statements our supreme court and this Court have found to be equivocal requests for counsel. *See Climer*, 400 S.W.3d at 563 ("I'm scared to without an attorney here."); *Davis*, 512 U.S. at 462 ("Maybe I should talk to a lawyer."); *State v. Baechtle*, No. W2014-01737-CCA-R3-CD, 2016 WL 1564128, at *8 (Tenn. Crim. App. Apr. 15, 2016) ("I really do think that I need to have an attorney to sift through your interrogatories [to] make sure that you know you get the proper paper work."), *perm. app. denied* (Tenn. Sept. 22, 2016); *State v. Sanders*, No. M2005-02185-CCA-R3-CD, 2006 WL 3516210, at *8 (Tenn. Crim. App. Dec. 6, 2006) ("I guess I need a lawyer, don't I?"); *State v. Ake*, No. 01C01-9603-CC-00094, 1997 WL 311908, at *2 (Tenn. Crim. App. June 6, 1997) ("I probably need to get a lawyer, don't I?"), *perm. app. denied* (Tenn. Mar. 9, 1998). Accordingly, we conclude that the defendant's statements were equivocal requests for counsel and law enforcement officers were not required to cease questioning. Therefore, the trial court properly denied the defendant's motion to suppress, and the defendant is not entitled to relief on this issue.

## B. Voluntariness / Coercion

The defendant also argues that his statement was involuntary in that it was the "product of coercion" by the police; specifically, that he was cold, tired, questioned for a prolonged time, and extended promises of leniency. The State responds that "the totality of the circumstances weigh in favor of voluntariness." We agree with the State.

In order to be admissible, the defendant's statement must have been voluntarily given. *See Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991); *see also Climer*, 400 S.W.3d at 568 (stating "the voluntariness test remains distinct from *Miranda*"). A confession is involuntary if it results from "'any sort of threats or violence, . . . any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). "[T]he essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." *Climer*, 400 S.W.3d at 568. A defendant's subjective perception alone is insufficient to support a finding that a confession was not voluntary. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). Instead, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id.*

When evaluating the voluntariness of a statement, courts consider the totality of the circumstances, including "characteristics of [the] accused and details of the interrogation." *Climer*, 400 S.W.3d at 568. Relevant factors include:

[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id.*

The defendant asserts that his statement was involuntary because he was cold, tired, questioned for a prolonged time, and enticed by promises of leniency.

First, the record does show that the defendant expressed that he was cold and exhibited some physical signs of being cold, but he never asked for additional clothing, a blanket, or to stop the interview. In fact, several of the defendant's comments on being cold were encompassed within other discussions. The defendant was given three restroom breaks and therefore was not in the interrogation room continuously. The officers involved in the questioning testified at the suppression hearing that the room was not overly cold, that they had not asked for the room to be chilled, and that it was not their practice to ignore a suspect who was exhibiting signs of being cold. Of note, Agent Holt pointed out that "[s]ome of the things [people] also exhibit when they appear to be cold may be also signs of [their] nerves as a result of being a prisoner." The record does not support a conclusion that the defendant's will was overborne by the temperature in the room.

Second, while the interview occurred during the late hours of the night, the defendant never complained of being fatigued or sleepy. The defendant mentioned being "tired" once toward the very end of the interview, but to explain his reason for standing up. As noted by the trial court in ruling on the motion to suppress, "[i]n the absence of some evidence, the [c]ourt cannot assume that the defendant's will was overcome due to lack of sleep." The defendant's claim that he was coerced into giving a statement due to the "many hours of interrogation and lack of sleep" is not borne out by the evidence.

Third, while the interview was lengthy, it was not excessively so. The questioning began at 8:37 p.m., and the defendant began making inculpatory admissions when the officers returned to the room at 2:53 a.m. Prior to that time, the officers were out of the room for an almost hour and forty-five-minute time period, during which no questioning occurred. As observed by the trial court in ruling on the motion to suppress, "While the interview stretched over several hours, the actual questioning did not occur continuously over the entire period. The defendant was given restroom breaks, and a period of an hour

- 14 -

and a half when he was not questioned at all." We conclude that the defendant's statement was not the product of coercion due to the length of the interview.

Fourth, the defendant was not made promises of leniency. It was clearly explained to the defendant that the district attorney would be the one to make any charging decisions. There were discussions in which the officers said the district attorney wanted to know if the defendant was cooperating, but no promises of leniency were offered. When the defendant asked if there was a way to "fix" the situation, Agent Adkins expressed that the only way things would change is if the defendant told the truth and provided something to present to the district attorney. Agent Holt agreed that he told the defendant that he could tell the district attorney that the defendant was truthful, explaining that "[t]he insinuation is that when you do tell the truth and that you are being cooperative you can at least explain to the District Attorney that they are willing to be forthcoming in the information that they have provided concerning the case." Telling the defendant that being truthful was the only way to possibly aid his position does not equate to a "promise of leniency." *See State v. Schreane*, No. E2005-00520-CCA-R3-CD, 2006 WL 891394, at \*5 (Tenn. Crim. App. Apr. 5, 2006) (finding no coercion where officer "only promised the defendant to help him with the district attorney's office by telling them that the defendant had cooperated"), *perm. app. denied* (Tenn. Aug. 28, 2006).

In conclusion, upon our review of the transcript of the defendant's interview as well as the video of the interview itself, we determine that the totality of the circumstances indicates that the defendant's statement was voluntary and not the product of coercion. At the time he was questioned, the defendant was thirty-seven years old and had owned his own business, indicating a reasonable level of intelligence. The defendant had "several" instances of prior experience with the police, so he was not naive to the criminal justice process. He was advised of his constitutional rights and was never physically abused or threatened with abuse. There was no indication of the defendant being injured, intoxicated, drugged, or in ill health when he gave the statement. Although the defendant was not offered food, his questioning began after dinner hours, and he specifically said to the officers, "I'm not going to ask you to order me no pizza or nothing." The defendant never indicated that he was fatigued and wished to cease the interview. The record supports the trial court's conclusion that the police did nothing to overcome the defendant's will to the degree that his statement was involuntary or coerced. The trial court did not err in denying the motion to suppress, and the defendant is not entitled to relief.

## C. Harmless Error

Even if the trial court erred in admitting the defendant's statement, we conclude that the error is harmless.

The erroneous admission of evidence obtained in violation of a defendant's *Miranda* rights is a non-structural constitutional error, and as such, is subject to . . . harmless error

- 15 -

analysis." *Climer*, 400 S.W.3d at 569-70. The question is "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 569 (quoting *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). The State carries the burden of demonstrating the error was harmless. *Rodriguez*, 254 S.W.3d at 371.

True, the defendant's statement connected him to the vicinity of the victim's home, but he also claimed that he was tricked into being there, that he threw the gun away, and that he did not go to the victim's house. The overwhelming evidence of the defendant's guilt came from co-defendant Amy Hankins' testimony, portions of which were corroborated by Ms. Gilliam, Officer Smith, Agent Betts, and the surveillance video. As we will address in Section IV below, the convicting evidence was more than sufficient even without the defendant's lukewarm statement. Thus, even if it was error to admit the statement, the error was harmless beyond a reasonable doubt.

## D. Denial of Permission for Interlocutory Appeal

Encompassed within his argument regarding the denial of the motion to suppress, the defendant avers, without any supporting argument, that the trial court erred in denying his "subsequent motion for rule 9 interlocutory appeal as to the court's order."

When a trial court denies a motion for interlocutory appeal, a defendant can either seek an extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure or can seek a Rule 3 appeal as of right following the conclusion of the case. *State v. Funk*, No. E2022-01367-CCA-R3-CD, 2023 WL 7130289, at *3 (Tenn. Crim. App. Oct. 30, 2023) (citing *State v. Lalone*, 2017 WL 2297653, at *9 (Tenn. Crim. App. May 25, 2017); Tenn. R. App. P. 3). "Once a defendant exercises either of these options, the trial court's previous denial of an interlocutory appeal is of 'no effect.'" *Funk*, 2023 WL 7130289, at *3 (citing *State v. Johnson*, No. E2010-02659-CCA-R10-CD, 2012 WL 1306440, at *10 (Tenn. Crim. App. Apr. 16, 2012), *perm. app. denied* (Tenn. Aug. 15, 2012); *State v. Simmons*, No. M2018-00937-COA-R3-CV, 2018 WL 6721801, at *5 (Tenn. Ct. App. Dec. 21, 2018)).

The defendant did not seek an extraordinary appeal after the trial court denied his motion for an interlocutory appeal. Now that the case is on direct appeal, "the earlier denial of an interlocutory appeal is of no effect." *Funk*, 2023 WL 7130289, at *3. The defendant is not entitled to relief.

## II. Search and Seizure

The defendant argues that his Fourth Amendment right against unreasonable searches and seizures was violated because he was brought in for questioning based solely on the uncorroborated statement of a co-defendant and, therefore, his statement to police should be suppressed. The State responds that the defendant has waived this issue and not established entitlement to plain error relief. We agree with the State.

The Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution guarantee freedom from unreasonable searches and seizures. These guarantees exist to "safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967); *see State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Yeargan*, 958 S.W.2d at 629.

An appellate court may review an unpreserved error pursuant to the plain error doctrine, if the defendant bears his or her burden to show that all five prerequisites are satisfied:

> (1) The record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

*State v. Dotson*, 450 S.W.3d 1, 49 (Tenn. 2014) (quoting *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007)). "To rise to the level of plain error, [a]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (alterations in original) (internal quotation marks omitted) (quoting *State v. Banks*, 271 S.W.3d 90, 127 (Tenn. 2008)). "If a defendant fails to establish any of these criteria, an appellate court must deny relief under the plain error doctrine, and an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020).

As noted by the State, the defendant did not raise this issue before or during trial and has, therefore, waived appellate review. Moreover, he has not asked for plain error review or attempted to establish his entitlement to such. While his argument is not entirely clear, it appears that the defendant is challenging the search warrant that led to his being brought in for questioning on March 27, 2017, and not the arrest warrant officers secured on March 28, 2017, following his interview with the police. However, the search warrant does not appear in the record before this Court, and we are, therefore, unable to make any sort of determination as to its basis. As such, the defendant is not entitled to plain error relief because the record does not clearly establish what happened in the trial court.[3]

---

[3] We note that present defense counsel filed two "memorandum[s] in support of amended motion for new trial," although no amended motion for new trial appears in the record. In the second of the memorandums, counsel raised the same issue regarding the validity of the search warrant as discussed in Section II of this

In addition, as we will address in Section IV below, the evidence is sufficient to sustain the defendant's convictions even without the defendant's admission. Accordingly, consideration of the alleged error is not necessary to do substantial justice because we cannot say that it "probably changed the outcome of the proceeding." *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (internal quotation omitted).

## III. Witness Testimony

The defendant argues that the trial court erred in allowing witness testimony concerning his prior purchase of drugs from the victim, his "habit" of keeping a gun under the hood of his car, and his being "suited and booted" when he left the house the night of the murder. The State responds that the trial court did not abuse its discretion in admitting any of the aforementioned testimony. We agree with the State.

The admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse of discretion. *See State v. Clayton*, 535 S.W.3d 829, 859 (Tenn. 2017). This Court finds an abuse of that discretion when the trial court applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

---

Court's opinion. In its order on the motion for new trial, the trial court did not directly address the validity of the search warrant but indicated that counsel "argued [at the hearing] that the original affidavit of complaint . . . did not sufficiently set forth probable cause," although the "court file does not contain a pleading with that ground set forth as a basis for new trial." Even if we were to conclude that the defendant properly preserved the issue by its de minimus inclusion in a memorandum to a non-existent motion, we would nevertheless determine that the issue is waived for failure to include an adequate record for our review because the search warrant is not the record before us. *See* Tenn. R. App. P. 24(b). "Where . . . the record is incomplete, and does not contain . . . portions of the record upon which a party relies, this Court is precluded from considering the issue." *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1998) (citing *State v. Groseclose*, 615 S.W.2d 142, 147 (Tenn. 1981); *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)).

In addition, Rule 404(b) of the Tennessee Rules of Evidence generally prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). However, Rule 404(b) permits evidence when offered to prove some issue other than character or propensity relevant to trial. *State v. Moore*, 6 S.W.3d 235, 239 (Tenn. 1999). Material issues on which 404(b) evidence may bear include: "(1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation." *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004); *State v. Gilliland*, 22 S.W.3d 266, 271 n.6 (Tenn. 2000).

The rule sets out certain procedural requirements the trial court must satisfy before such evidence is admissible:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). If the trial court substantially complies with the procedures set forth therein, this Court affords great deference to the trial court's decision to admit evidence under Rule 404(b) and will only overturn that decision if the court abused that discretion. *State v. Hawkins*, 519 S.W.3d 1, 45 (Tenn. 2017).

The defendant asserts that the trial court erred in allowing Agent Adkins to testify regarding the defendant's prior drug purchase from the victim. During his testimony, Agent Adkins was asked whether the defendant had been to the victim's home prior to the night of the murder. Agent Adkins responded, "During the initial interview with him he said that he went there with Amy and they brought drugs from there." Defense counsel objected and the trial court conducted a jury-out hearing. After hearing arguments from the parties, the trial court found that the testimony was admissible for the purpose of establishing a connection between the defendant and the victim and "goes to the State's theory as to the purpose" of the victim being chosen as a target. Although the trial court did not expressly state that proof of the prior conduct was clear and convincing, the defendant freely admitted to the prior bad act during the investigation, s*ee State v. Clark*, 452 S.W.3d 268, 291 (Tenn. 2014) (ruling that the "clear and convincing . . . hurdle [wa]s easily cleared" where defendant "freely admitted" to the prior bad act conduct), and the

record reflects that the trial court was quite familiar with Rule 404 and its requirements. Moreover, the trial court gave the jury a limiting instruction regarding the testimony immediately after the bench conference as well as in its final charge, and we presume the jury followed the court's instructions. *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001); *State v. Starner*, No. M2014-01690-CCA-R3-CD, 2016 WL 1620778, at *21 (Tenn. Crim. App. Apr. 20, 2016) (citing *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006)). In our view, the trial court substantially complied with Rule 404 and properly admitted the evidence of the defendant's prior bad act for a non-propensity purpose. The defendant is not entitled to relief on this issue.

The defendant also raises two challenges to Amy Hankins' testimony; specifically, to her testifying that the defendant had a "habit" of placing a gun under the hood of his car, and that the defendant was "suited and booted" when he left the house the night of the murder.

With regard to Amy's testimony about the defendant's "habit" of placing a gun under the hood of the car, it is not clear whether such testimony qualifies as habit evidence under Tennessee Rule of Evidence 406 because Amy's specific testimony was that the defendant placed a weapon under the hood of their vehicle "on occasion." Regardless of whether such testimony rises to the level of "habit evidence," any error is harmless because Amy testified that she specifically saw the defendant place a gun under the hood of the truck on the night of the murder regardless of whether it was his "habit" to do so. Additionally, we note that while the defendant contested Amy's testimony concerning the defendant's "habit" under Tennessee Rule of Evidence 406 at the motion in limine, he seemingly challenges it, with little supporting argument, under Rules 401, 403, and 404 on appeal. It is well settled that an appellant cannot change theories for relief from the trial court to the appellate court. Accordingly, his new theory is waived on appeal. *See State v. Dooley*, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000).

With regard to Amy's testimony that the defendant was "suited and booted" when he left the house the night of the murder, we have reviewed the entirety of Amy's testimony at trial, and she never referred to the defendant and/or any co-defendants as being "suited and booted." While such phrase was discussed during a jury-out hearing, it was never used in front of the jury and does not appear in any of the trial exhibits. This issue is without merit.

## IV. Sufficiency

The defendant argues that the evidence is insufficient to sustain his convictions for first-degree felony murder. The State responds that the "evidence, including Hankins's heavily corroborated testimony, was sufficient to convict [the defendant] of felony murder." We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *See id.* at 379. Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for

those drawn by the trier of fact. *Id.* This Court will not exchange its "inferences for those drawn by the trier of fact from circumstantial evidence." *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

As relevant to this appeal, first-degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery, burglary, [or] theft[.]" Tenn. Code Ann. § 39-13-202(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building and commits or attempts to commit a felony, theft, or assault[.]" *Id.* § 39-13-1002(a)(3). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a).

Upon our review, we conclude that the evidence is sufficient to sustain the defendant's conviction for felony murder. In the light most favorable to the State, the evidence shows that the defendant and his co-defendants developed a plan to steal from the victim. According to the defendant's girlfriend, Amy Hankins, she and the defendant "needed money," which was why the defendant was involved. The defendant was familiar with the victim's home because the defendant had admittedly purchased drugs from the victim in the past. After the victim's death was discovered, officers found drugs and money in the house, supporting the reason the victim's home was a target.

Amy Hankins testified that the night of the murder, the defendant and co-defendants Perry and Powell left her and the defendant's home in co-defendant Perry's white truck. Before leaving, they placed their weapons under the hood of the truck. Surveillance footage from an apartment complex close to the victim's home captured a white truck pull into the apartment complex and two African-American men walk into the apartment complex and get into the truck. The driver and one of the passengers got out of the truck, walked to the front, and raised the hood. The men stood at the hood for a little bit, closed the hood, and got back into the truck. Soon after, the two passengers got out of the truck and walked in the general direction of the victim's home. The surveillance footage corroborates Amy's account of the men having placed a gun under the hood of the truck before the defendant and co-defendants Powell and Perry left their home. The surveillance footage also corroborates Amy's account of co-defendant Powell being dressed in all black and the defendant being dressed in black pants and a blue shirt. Further, Amy testified that the defendant had a nine-millimeter handgun on the night of the murder, and the victim was shot with a nine-millimeter.

Amy Hankins also testified that two days before the murder, the defendant and at least one co-defendant had attempted the burglary of the victim's residence but went to the wrong house, a home belonging to "an elderly white lady," and left a crowbar and bandana. Wanda Gilliam corroborated Amy's testimony by her account of her home being broken

- 22 -

into two nights before the victim's murder and the offenders leaving a crowbar and "scarf" at her house. Officer Rick Smith also corroborated those details and noted that Ms. Gilliam's house looked similar to the victim's and was close by.

The trial court instructed the jury that the "defendant cannot be convicted upon the uncorroborated testimony" of an accomplice, and that Amy "was an accomplice in this alleged crime, and before the defendant can be convicted, you must find that this accomplice testimony has been sufficiently corroborated." We presume the jury followed the trial court's instructions. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). The evidence is sufficient for a rational trier of fact to find the defendant guilty of felony murder, and the defendant is not entitled to relief.

Furthermore, although we determine the evidence to be sufficient without it, we note that the defendant gave a statement to the police in which he admitted to tenuous involvement in the crime, albeit claiming he was "tricked."

Also, encompassed within his challenge to the sufficiency of the evidence, the defendant complains, without any citation to authorities, that the trial court erred in "summarily deny[ing]" his motion for new trial. However, we observe that the record reflects the trial court did not "summarily deny" the motion for new trial but instead held a hearing and addressed each of the defendant's complaints in a seven-page order. Accordingly, the defendant is not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

s/ J. ROSS DYER
J. ROSS DYER, JUDGE

- 23 -